# No. 25-11351

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

*Amy Anderton,*

Plaintiff - Appellant

v.

*Dallas Independent School District,*

Defendant - Appellee

---

**On Appeal from**
United States District Court for the Northern District of Texas
3:23-CV-2696

---

## BRIEF OF APPELLANT AMY ANDERTON

---

Stefanie M. Klein 11565650
Frank Hill 09632000
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222)
sklein@hillgilstrap.com
fhill@hillgilstrap.com

**ATTORNEYS FOR APPELLANT AMY ANDERTON**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Appellee:** | **Counsel for Appellee:** |
|---|---|
| Dallas Independent School District | Kathryn Long of Thompson & Horton, L.L.P. Dallas, TX<br>Adam Rothey of Thompson & Horton, L.L.P. Dallas, TX<br>Emily Adams of Thompson & Horton, L.L.P. Dallas, TX |

| **Appellant:** | **Counsel for Appellant:** |
|---|---|
| Amy Anderton | Frank Hill of Hill Gilstrap, P.C. Arlington, TX<br>Stefanie Klein of Hill Gilstrap, P.C. Arlington, TX |

*/s/ Stefanie Klein*
Stefanie Klein

# STATEMENT REGARDING ORAL ARGUMENT

Dr. Anderton respectfully requests oral argument. The Court will review *de novo* the summary judgment granted by the district court in this case. Hearing from the parties and allowing the parties to address questions at oral argument would help the Court's analysis of the genuine issues of material fact regarding Dr. Anderton's claims.

# TABLE OF CONTENTS

Contents Page(s)

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS ..................................................................................... iii

TABLE OF AUTHORITIES ..................................................................................v

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES............................................................................2

1. The district court erred in determining that Dr. Anderton did not satisfy her prima facie burden of to show discrimination, incorrectly concluding that Dr. Anderton's duties were "distributed among the new positions that DISD created." ROA.1160.

2. The summary judgment evidence would permit a jury to conclude that DISD's reasons for terminating Dr. Anderton were pretextual, and that her race was a motivating factor in her termination.

3. The summary judgment evidence would permit a jury to conclude that DISD's reasons for terminating Dr. Anderton were pretextual, and that but for her age, she would not have been terminated.

INTRODUCTION ..................................................................................................3

STATEMENT OF THE CASE...............................................................................6

<u>Structure of Academic Services</u>

<u>Dr. Anderton visits Student 1 and Student 2</u>

The PSO Report

DISD's Later Versions of Events

Termination

Post-Termination

SUMMARY OF THE ARGUMENT ....................................................................13

ARGUMENT ..............................................................................................19

A. STANDARD OF REVIEW CONCLUSION ......................................19

B. REPLACEMENT BY DR. LISA WHITAKER ..................................20

C. PRETEXT SUFFICIENT TO PERMIT FINDING OF RACE DISCRIMINATION UNDER TITLE VII ..........................................22

D. PRETEXT SUFFICIENT TO PERMIT FINDING OF AGE ................ DISCRIMINATION UNDER THE ADEA:......................................27

CERTIFICATE OF SERVICE ....................................................................31

CERTIFICATE OF COMPLIANCE ...........................................................32

# TABLE OF AUTHORITIES

**Cases** ........................................ **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505 (1986) ........................................19

*Autobahn Imps., L.P. v. Jaguar Land Rover N. Am., L.L.C.*,
896 F.3d 340 (5th Cir. 2018) ........................................20

*Batiste v. Lewis*,
976 F.3d 493 (5th Cir. 2020) ........................................19

*Batyukova v. Doege,*
994 F.3d 717 (5th Cir. 2021) ........................................ 14, 20

*Bogan v MTD Consumer Group, Inc.*,
No. 17-60697, 2016 U.S. Dist. LEXIS 86092 (N.D. Miss. Jul. 1, 2016) ...........21

*Boudreaux v. Swift Transp. Co.*,
402 F.3d 536 (5th Cir. 2005) ........................................19

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*,
482 F.3d 408 (5th Cir. 2007) ........................................19

*Burton*,
798 F.3d at 241 ........................................27

*Churchill v. Tex. Dep't of Crim. Just.*,
539 F. App'x 315 (5th Cir. 2013)........................................28

*Crawford v. Formosa Plastics Corp.*,
234 F.3d 899 (5th Cir. 2000) ........................................27

*Delaval v. Ptech Drilling Tubulars, L.L.C.*,
824 F.3d 476 (5th Cir. 2016) ........................................23

*Dewan v. M-I, L.L.C.*,
858 F.3d 331 (5th Cir. 2017) ........................................................................19

*EEOC v. LHC Grp., Inc.*,
773 F.3d 688 (5th Cir. 2014) ........................................................................23

*Fahim v. Marriott Hotel Servs.*,
551 F.3d 344 (5th Cir. 2008) ........................................................................23

*Gross v. Carlisle Constr. Materials, L.L.C.*,
No. 24-60382, 2025 WL 2427194, at *2 (5th Cir. Aug. 22, 2025)......................23

*Guillory v. Domtar Indus. Inc.*,
95 F.3d 1320 (5th Cir. 1996) ........................................................................20

*Hemphill v. State Farm Mut. Auto. Ins. Co.*,
805 F.3d 535 (5th Cir. 2015) ........................................................................19

*January v. City of Huntsville*,
74 F.4th 646 (5th Cir. 2023)........................................................................23

*Kitchen v. BASF*,
952 F.3d 247 (5th Cir. 2020) ........................................................................13

*Kopszywa v. Home Depot USA, Inc.*,
620 F. App'x 275 (5th Cir. 2015)...................................................................27

*Laxton*,
333 F.3d at 578 ............................................................................................23

*Lyons v. Katy Indep. Sch. Dist.*,
964 F.3d 298 (5th Cir. 2020) ................................................................. 14, 19

*Machinchick v. PB Power, Inc.*,
398 F.3d 345 (5th Cir. 2005) ........................................................................15

*Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*,
662 F.3d 376 (5th Cir. 2011) .......... 19

*Moore v. LaSalle Mgmt. Co., L.L.C.*,
41 F.4th 493 (5th Cir. 2022) .......... 19

*Perry v. H.J. Heinz Co. Brands, L.L.C.*,
994 F.3d 466 (5th Cir. 2021) .......... 20

*Pratt v. City of Houston*,
247 F.3d 601 (5th Cir. 2001) .......... 28

*Rachid v. Jack in the Box, Inc.*,
376 F.3d 305 (5th Cir. 2004) .......... 22, 23

*Reeves v. Sanderson Plumbing Prods. Inc.,*
530 U.S. 133 (2000) .......... 14, 20, 27

*Ross v. Judson Indep. Sch. Dist.*,
993 F.3d 315 (5th Cir. 2021) .......... 15

*Rubinstein v. Adm'rs of the Tulane Educ. Fund*,
218 F.3d 392 (5th Cir. 2000) .......... 27

*Seigler v. Wal-Mart Stores Tex., L.L.C.,*
30 F.4th 472 (5th Cir. 2022) .......... 14, 20

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993) .......... 28

*Thomas v. Tregre*,
913 F.3d 458 (5th Cir. 2019) .......... 15

*United States ex rel. Taylor-Vick v. Smith*,
513 F.3d 228 (5th Cir. 2008) .......... 20

*Vasquez-Duran v. Driscoll Child.'s Hosp.*,
No. 20-40837, 2021 WL 3775350, at *4 (5th Cir. 2021)....................................22

*Vaughn*,
665 F.3d at 636 ..........................................................................................23

*Wallace*,
777 F. App'x at 89 .......................................................................................23

*Walton v. Bisco Indus., Inc.*,
119 F.3d 368 (5th Cir. 1997) .......................................................................27

**Statutes**

28 U.S.C. § 1291 ...........................................................................................1
28 U.S.C. § 1331 ........................................................................................... 1
29 U.S.C. §§ 621 et. seq.................................................................................1
42 U.S.C. § 2000e *et seq*. .................................................................................1

**Rules**

Fed. R. App. P. 28(a)(4)...................................................................................1
Fed. R. Civ. P. 56(a).......................................................................................19

# JURISDICTIONAL STATEMENT

Pursuant to Fed. R. App. P. 28(a)(4), Dr. Anderton states the following regarding jurisdiction:

(A) Dr. Anderton brought claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et. seq.; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. ROA.364-365. The district court therefore had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

(B) This Court has appellate jurisdiction under 28 U.S.C. § 1291, because this is an appeal from a final judgment of a district court. ROA.1165.

(C) The district court's final judgment was signed on November 18, 2025. *Id.* Dr. Anderton timely appealed on December 15, 2025. ROA.1176.

(D) The district court's final judgment disposed of all parties' claims. ROA.1165.

# STATEMENT OF THE ISSUES

The district court erred in granting summary judgment because the summary judgment evidence raised genuine issues of material fact as to both Dr. Anderton's prima facie case of discrimination (Issue 1), and whether DISD's stated reasons for her termination were pretextual (Issues 2 and 3).

1. The district court erred in determining that Dr. Anderton did not satisfy her prima facie burden of to show discrimination, incorrectly concluding that Dr. Anderton's duties were "distributed among the new positions that DISD created." ROA.1160.

2. The summary judgment evidence would permit a jury to conclude that DISD's reasons for terminating Dr. Anderton were pretextual, and that her race was a motivating factor in her termination.

3. The summary judgment evidence would permit a jury to conclude that DISD's reasons for terminating Dr. Anderton were pretextual, and that but for her age, she would not have been terminated.

# INTRODUCTION

In December 2023, Dallas Independent School District fired Dr. Amy Anderton, its Director of World Languages, on her sixtieth birthday. ROA.375.

Dr. Anderton was among almost 20 central staff members – each either white, over 50, or both – whom DISD shed during the same time period. ROA.537-539 (Abel Decl. ¶¶ 55-58). According to DISD, some of these employees were part of a "Central Staff Reduction Initiative," and some retired. *Id*. DISD retained or "rehired" younger non-white employees, while the older employees, especially older white employees, found themselves bearing the brunt of "restructuring" and initiatives to reduce staff. *Id.*

In this environment, Dr. Anderton, then a fifty-nine-year-old white woman, found herself in a situation for which all her years of training did not prepare her. She made a judgment call, because a student was in distress, and she wanted to help him. The decisions she made led to her termination.

The situation arose in September 2023, when Dr. Anderton learned that the sons of two of her good friends, who had been taken into foster care, were enrolled in DISD. ROA.472. She learned this while performing her job duties. Because the family spoke German at home, the boys appeared on reports she received as Director of World Languages, and she saw a name she recognized. ROA.927. She knew the

children were in foster care, and that they had weekly supervised visits with their parents. ROA.472.

Her department, in addition to supporting teachers of languages other than English (“LOTE”), also provided support directly to students such as these, i.e., a German speaker enrolled in Spanish I. ROA.473. She visited the older boy at his high school to see if the placement in a Spanish class was appropriate. ROA.927-928. While visiting with him in that regard, other issues arose and he she let him speak with his father on her cell phone. *Id.*

Her contact with the student, and with his brother, whom she visited at his elementary school, was reported to DISD by the foster mother. ROA.770-771. DISD investigated Dr. Anderton’s interactions with the students and then terminated her. No lesser discipline was considered.

DISD alleges that she violated district policies, but which policies were violated – and how she had violated them – changed as the investigative and termination process went along. Even after termination, once Dr. Anderton alleged that DISD’s actions were discriminatory, DISD’s administrators and representatives continued to embellish and change the basis for her dismissal. The credibility of those witnesses can only be determined by a jury, which, contrary to the district court’s analysis, could well find DISD’s reasons for terminating Dr. Anderton to have been pretextual. Additionally, the summary judgment evidence raised genuine

issues of material fact regarding whether the supposed policy violations were merely pretext to terminate a member of central staff whose race and age were the true deciding factors.

Once Dr. Anderton had been terminated, Academic Services undertook another restructuring, and all director-level administrators were "released" and then permitted to apply again for the fewer director positions which were left. ROA.911-912. Dr. Lisa Whitaker, a director who had overseen STEM, Health, and Physical Education, applied for a newly created director position over Health, Physical Education, and World Languages. She was selected for that position, replacing Dr. Anderton as the supervisor of the world languages staff. *Id.* Dr. Whitaker is African-American and over 15 years younger than Dr. Anderton. ROA.1030, (Whitaker Decl. ¶ 3)

## STATEMENT OF THE CASE

Dr. Anderton was a member of DISD's central staff, one of a number of directors within Academic Services. She was the director of World Languages, and she oversaw three coordinators. DISD employed no other director of World Languages, and Dr. Anderton's staff reported directly and exclusively to her.

Her job duties included providing instructional support to DISD's foreign language teachers, through curriculum, coaching, and professional development, as well as working with counselors and students as necessary. ROA.470, 946.

In her 2022-2023 year-end review, her then-supervisor rated her overall as "exceeds expectations," and described her as follows:

> Amy is deeply passionate about the LOTE [Languages Other Than English] work and how it impacts students' learning experiences. She has consistently shown a strong ability to think outside the box and bring fresh, innovative ideas to the table, as evidenced by supporting the DOI initiative with LOTE teachers, revising the curriculum, and beginning to collect data on proficiency-based language instruction in the classroom. I look forward to her continued growth as a leader of others, and with a focus in this area, she will create an even stronger and more cohesive team.

District Court Doc. 52, App 0133-0134

<u>Structure of Academic Services</u>

Beginning in July 2023, Dr. Anderton reported to a newly hired deputy chief for Academic Services, Dr. Elena Hill. Dr. Hill and Dr. Michelle Broughton were

then the two deputy chiefs in Academic Services. Beginning in late September 2023, Angie Gaylord became Chief of Academic Services, and Dr. Hill and Dr. Broughton reported to her.

Both Deputy Chiefs and the Chief of Academic Services were younger than Dr. Anderton and both deputy chiefs are African-American. During the same time period, Dr. Anderton was aware of over a dozen other older women – most of whom were white – whom DISD phased out in one manner or another from their roles as directors, or elsewhere in central staff. ROA.500.

In September 2023, after 36 years in education, and nine years as DISD's Director of World Languages, Dr. Anderton made visits to two schools, and spoke with two children whose biological parents were close friends of hers. The children and their siblings were in foster care, pending investigations of their biological parents, Dr. Anderton's friends.

The foster mother of the two children made a complaint to DISD, concerned that her family's privacy had been compromised when Dr. Anderton permitted the older child to speak on her phone to his biological father.

DISD placed Dr. Anderton on paid leave while its Professional Standards Office ("PSO") investigated the allegations against her. Two allegations were made; the PSO's investigative report (the "PSO Report") substantiated one allegation, but failed to substantiate the other.

The PSO Report

The first question to be answered was, "Did Anderton use her District assignment to locate and meet with the students for non-district purposes?" ROA.921 (PSO Report p.2).

The PSO report concluded that Dr. Anderton "used her District assignment to meet with Student 1 and Student 2." ROA.803; that there were indications "Anderton's intended purpose for visiting Spruce HS was, *in part*, to circumvent the CPS process," (ROA.804); and that "[Dr. Anderton] violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules *in part* for a personal purpose. ROA.804 (emphasis added).

The second question was "Did Anderton access and relay confidential information to Student 1 and Student 2's parents or others in violation of District policy?" ROA.796. The PSO Report concluded, "[t]he allegation that Anderton relayed confidential information to the student[s'] parents is unsubstantiated." ROA.795, 804. "No evidence was obtained during the PSO review that showed Anderton shared [the foster parent's confidential] information with Student 1 or Student 2's parents or others." ROA.804 (PSO Report p. 10). The PSO obtained no evidence that showed Dr. Anderton shared information about the foster parents with the students' biological parents or anyone else. *Id.*

According to the PSO Report, the following policies were applicable to the investigation: DH (EXHIBIT) - Ethical Conduct Toward Students, DH (REGULATION) - Cellular Phones, CQ Series [technology resources], and 2023-2024 Student Code of Conduct – Cellular Phones/Electronic Devices. ROA.922.

DISD's Later Versions of Events

The PSO investigator, Chris Lyle, provided a declaration in support of summary judgment which goes far beyond his report ROA.769-786. The language of the report, "in part for a personal purpose" becomes "for personal advantage" in Mr. Lyle's declaration. ROA.780, (Lyle Decl. ¶ 26). In his declaration, Lyle says that he "found" that Dr. Anderton acted for personal advantage, but no such finding appears anywhere in the PSO Report – neither "personal advantage" nor "personal benefit." ROA.795-806. The word "benefit" appears nowhere in the report, and "advantage" appears only when Dr. Anderton reports explaining the advantages of "testing out" or "transferring out" to Student 1. ROA.802 (PSO Report, p.8)

The declaration of Angie Gaylord, the Chief of Academic Services, who concurred in the recommendation of termination, was also offered in support of summary judgment. ROA.906-915. Ms. Gaylord states, "The PSO Report of Investigation found that Dr. Anderton violated these policies when she used her position and District resources for her own *personal gain*." ROA.909 (Gaylord Decl.

¶ 12) (emphasis added). Again, the word "gain" never appears in the PSO Report, much less "personal gain."

Termination

Dr. Anderton's direct supervisor – who had only been her supervisor for two months, ROA.938 (Hill Decl ¶ 2-3) – received the PSO report and recommended termination. ROA.997. The next level supervisor, Angie Gaylord, who had only been in such position since the week Dr. Anderton was put on administrative leave, concurred. ROA.908 (Gaylord Decl. ¶ 7). Their recommendation letter mentions two policies, "DH (Exhibit) and DH(Regulation)" ROA.997.

DISD's next step in employee termination is the Legal Review Committee. According to Robert Abel, the head of the committee, "The District could not continue to employ an employee, not to mention a director level employee, who abused her District power to circumvent CPS's lawful authority and endanger students." ROA.527. No explanation for how Dr. Anderton's actions endangered students has been offered.

DISD then issued a termination letter to Dr. Anderton, conveying the news that she had been fired. ROA.723-725. The termination letter, signed by Mr. Abel, states that Dr. Anderton had violated FL (Legal and Local) and DH (Exhibit). ROA.724. Nothing up to that point mentioned FL (Legal and Local). The letter states, in its final bullet point,

> Your actions placed both Student 1 and Student 2 in serious danger. The placement of students in CPS custody is a serious matter, and we cannot risk the *continuation of possible abuse by allowing students to communicate with their alleged abusers.* Despite your admission that you knew Student 1 and Student 2 were in CPS custody and under the guise of performing your job duties, you improperly used your title and badge to enter schools for *the sole purpose* of accessing student 1 and Student 2. Moreover, your unauthorized visits with Student 1 and Student 2 removed them from valuable class instruction time and removed you from your duties as Director of World Languages.

ROA.724 (emphasis added). This is the first time the notion that the children were removed due to suspected abuse comes into the discussion. There is nothing in the PSO Report or its supporting documents mentioning abuse – actual or suspected. The only mentions of abuse related to the parents of the children come from Robert Abel, who played no role in the investigation and had no personal knowledge of the CPS case. According to Chris Lyle, the investigator who conducted the many interviews and drafted the PSO Report, Mr. Lyle attended the legal review committee meeting in case the committee had questions, but he does not recall any questions. ROA.784 (Lyle Decl. ¶ 35). There were no changes to the PSO Report after the meeting, and "the Legal Review Committee did not request any follow up." *Id.*, ¶ 34.

<u>Post-Termination</u>

Dr. Anderton appealed her termination internally with DISD. ROA.745. She then filed charges with Equal Employment Opportunity Commission ("EOCC") under Title VII and the ADEA, and received her notices of right to sue on May 7, 2024, ROA.357 (ADEA) and ROA.362 (Title VII).

Dr. Anderton's lawsuit was already on file at that time, but was held in abeyance awaiting her notices of right to sue. ROA.243-244. The parties notified the district court that Dr. Anderton had exhausted her administrative remedies, and the case proceeded. ROA.245-253.

Summary judgment was granted in favor of DISD on November 18, 2024. ROA.1165. Dr. Anderton timely appealed on December 15, 2025. ROA.1176.

## SUMMARY OF THE ARGUMENT

In its analysis of the summary judgment record, the district court reviewed the elements of Dr. Anderton's claims, and the burdens on each party in a Title VII discrimination and an ADEA discrimination case. ROA.1156-1169. These standards were correctly stated, but incorrectly applied.

Rather than construing all evidence in the light most favorable to Dr. Anderton, as the non-moving party, the court weighed issues of credibility in favor of DISD. Dr. Anderton and her counsel raised doubts regarding DISD's shifting accounts of Dr. Anderton's policy violations, and particularly the ill-fitting Ethics Standard 1.4: An "educator shall not use institutional or professional privileges for personal or partisan advantage." ROA.527 (Abel Decl. ¶ 32). ROA.685 (DH (Exhibit) Educators' Code of Ethics).

Yet the district court incorrectly dismissed her arguments as "disputing the facts underlying her termination." ROA.1162. What she disputes is the validity of DISD's stated reasons for her termination, based on how the difference between the evidence found by the investigators and the statements of DISD's witnesses.

The pretext inquiry focuses on whether defendant "reasonably believed its non-discriminatory reason for discharging [the plaintiff] and then acted on that basis." *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020). If DISD reasonably believed its non-discriminatory reason, why has it been necessary to reframe such

reason? That shifting description, without any rational explanation for how Dr. Anderton's actions were for her "personal gain," "personal benefit," or "personal advantage," raises genuine issues for a jury to decide regarding how worthy of credence DISD's stated reasons were.

If DISD truly believed its initial reasons for termination, why do its witnesses feel the need to embellish? Why is poor Chris Lyle having to shore up DISD's position, after the fact, by misrepresenting the findings of his own report? ROA.780.

All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150 (2000); *Seigler v. Wal-Mart Stores Tex., L.L.C.,* 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege,* 994 F.3d 717, 724 (5th Cir. 2021); *Lyons v. Katy Indep. Sch. Dist.,* 964 F.3d 298, 302 (5th Cir. 2020). All justifiable inferences are to be drawn, and all reasonable doubts resolved, in favor of Dr. Anderton as the non-movant. The court erroneously substituted its judgment for that of the jury in accepting DISD's unreliable and contradictory testimony.

First, Dr. Anderton's prima facie case of discrimination is based on two arguments. First, that she was replaced by a much younger African-American woman, and second, that her termination must be viewed in light of the ongoing transitions at DISD – whether termed "Central Staff Reduction Initiative" ROA.538

or "restructuring due to budget constraints" ROA.911 – which invariably left older white women out of jobs.

In order to state a prima facie case of race discrimination under Title VII, there must be evidence that Dr. Anderton

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group **or** was treated less favorably than other similarly situated employees outside the protected group.

*Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019)(citation omitted) (emphasis added). For age discrimination, the elements are similar:

> (1) she was within the protected class (*i.e.*, she was over 40years old) at the time of the challenged action; (2) she was qualified for the position; (3) the defendant discharged, refused to hire, or otherwise discriminated against her; and (4) (i) she was replaced by someone outside the protected class, or (ii) she was replaced by someone younger, or (iii) the discharge, refusal to hire, or other discrimination was otherwise because of her age.

See *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321-22 (5th Cir. 2021); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005).

The summary judgment evidence showed that all of Dr. Anderton's duties, rather than being redistributed among other employees, were put under one employee, Dr. Lisa Whitaker, Ph.D., "a 45-year-old Black female." ROA.1154. The first three elements of each of the tests above were not disputed; the question was whether Dr. Whitaker replaced Dr. Anderton.

Anderton was the only director of world languages in DISD. No one else had her exact job. But her job duties undisputably included supervising the world language staff members, and shortly after her termination, those duties were assigned to a younger, African-American co-worker.

The Court further erred by failing to take into account that relief under Title VII is available if race was even one motivating factor – not the sole motivation – in Dr. Anderton's termination. Dr. Anderton asserts that the shifting reasons given by DISD for her termination provide sufficient evidence of pretext to raise a fact issue precluding summary judgment.

However, even if DISD is to be believed, that the results of its investigation, including shoe-horning Dr. Anderton's conduct into a patently inapplicable policy violation, were genuine reasons for her dismissal, summary judgment should not have been granted. The evidence of 20 older, and almost uniformly white central staff all being discarded (five of which DISD admits were in positions similar to Dr. Anderton's) during this time period (ROA.537-539 (Abel Decl. ¶¶ 55-58)), raises a fact issue as to DISD's motivations, permitting a finder of fact to determine that Dr. Anderton's race played a part in her termination.

Because the shifting reasons for Dr. Anderton's termination raise a fact issue as to pretext, her age discrimination claim should also have survived summary judgment. The immediate reason for Dr. Anderton being put on leave, and DISD's

launch of an investigation, was a call by a foster parent concerned that her family's identity or location had been disclosed. Dr. Anderton was cleared of this charge by DISD's internal investigation, although the investigative report sustained a separate violation. Yet DISD's summary judgment evidence suggests that the head of the legal review board believed Dr. Anderton had "interfered in a CPS investigation". ROA.536 (Abel Decl. ¶ 52) "I am not aware of any District personnel who have remained employed by Dallas ISD after utilizing their District position to interfere with a CPS investigation.") *Id.*

That is exactly what the investigation found to be unsubstantiated. She did not interfere in the CPS investigation. She did not share confidential information about the children's whereabouts or the foster family. Instead, Dr. Anderton was found to have misused her district access.

Nevertheless, after going through the review board process, Dr. Anderton's offense had broadened to "complete disregard for the safety of students" (ROA.527) and use of her District position for "personal or partisan advantage" (*Id.*) which DISD cannot explain. DISD's briefing to the trial court repeated the transmutation of "in part for personal reasons," stating that it could "conclusively demonstrate that Anderton violated District policy by using her District position and access to District resources for her personal advantage, just as the PSO found." ROA.1149 (DISD

Reply, n. 2). Of course, the PSO found no such thing. There was no mention whatsoever of "personal advantage" in the PSO Report.

In reality, DISD may have acted prudently when it received the initial complaint from the foster mother, by putting Dr. Anderton on leave while it investigated. But the summary judgment record shows that when the investigative report came to Dr. Anderton's supervisor, there was no consideration of any type of discipline other than termination. The legal review committee further blew the events out of proportion, to an extent that calls into question the true reasons for Dr. Anderton's termination. Having so utterly failed to get its story straight, DISD's explanation for Dr. Anderton's termination is "unworthy of credence."

For her claim to survive summary judgment, she was required only to raise a genuine issue of material issue of a fact, such that reasonable jurors could find in her favor. Even if a jury might find the DISD's witnesses credible, credibility is not to be determined by the judge in a summary judgment decision. Dr. Anderton raised genuine issues of fact as to whether her employer's grounds for termination were pretextual, and summary judgment in favor of DISD should be reversed.

# ARGUMENT

## A. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo. Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 502 (5th Cir. 2022) (citing *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020)).

Therefore, this Court must determine whether DISD, as movant, has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)).

A material-fact dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505 (1986)).

To warrant judgment in his favor, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons*, 964 F.3d at 302 (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011).

All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler,* 30 F.4th at 472; *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021).

Summary judgment is generally inappropriate, however, when inferences the parties seek to draw deal with questions of motive and intent. *Autobahn Imps., L.P. v. Jaguar Land Rover N. Am., L.L.C.*, 896 F.3d 340, 350 n.23 (5th Cir. 2018); *see Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 476 (5th Cir. 2021) ("[S]ummary judgment is rarely proper when an issue of intent is involved." (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996))); *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (stating that "we hesitate to grant summary judgment when a case turns on a state of mind determination").

**B. REPLACEMENT BY DR. LISA WHITAKER:**

The district court erred in determining that Dr. Anderton did not satisfy her prima facie burden for discrimination, incorrectly concluding that Dr. Anderton's duties were "distributed among the new positions that DISD created," ROA.1160.

Below is a DISD website screen capture, showing Dr. Whitaker as "Director" and the world languages coordinators as her team:




ROA.368. Dr. Anderton's duties were not distributed, they were taken over by Dr. Whitaker, whether there was a two-step process of Dr. Whitaker giving up her position and then applying for a new one or not.

An employer intending to use a reduction in workforce to eliminate older, white employees cannot hide behind "restructuring." Here, the evidence is that 20 older employees, nearly all of them white, mostly in Central Staff, were no longer working at DISD, and Robert Abel had to explain for almost two pages why they were all gone, providing excuses in each case. ROA.537-539 (Abel Decl. ¶¶ 55-58).

In its de novo review of the record, this Court should recognize that the restructuring which DISD claims resulted in Dr. Whitaker taking over Dr. Anderton's job duties, does not automatically defeat the "replacement" argument. See, e.g., *Bogan v MTD Consumer Group, Inc.*, No. 17-60697, 2016 U.S. Dist. LEXIS 86092 (N.D. Miss. Jul. 1, 2016). In *Bogan*, the disciplinary actions taken

against the plaintiff were repeatedly upheld by seemingly independent reviewers, including some of her own race and gender, but the end result was the termination of the only black female in the tool and die department. There, given that all of her job duties were taken over by a white male, and the summary judgment evidence from the defendant was contradictory, Ms. Bogan survived summary judgment. *Id.* Obviously that case is not binding on this Court, but it illustrates that a totality of circumstances can create a fact issue as to whether a plaintiff has met her prima facie burden.

### C PRETEXT SUFFICIENT TO PERMIT FINDING OF RACE DISCRIMINATION UNDER TITLE VII

The summary judgment evidence would have permitted a jury to conclude that DISD's reasons for termination were pretextual, and that Dr. Anderton's race was a motivating factor in her termination.

To satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Vasquez-Duran v. Driscoll Child.'s Hosp.*, No. 20-40837, 2021 WL 3775350, at *4 (5th Cir. 2021) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)); *EEOC v. LHC*

*Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014) (quoting *Rachid*, 376 F.3d at 312); *accord Vaughn*, 665 F.3d at 636; *Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 349 (5th Cir. 2008).

The mixed-motive alternative only applies to Dr. Anderton's race discrimination claim, but the evidence here is such that she can meet the burden as to age discrimination as well, as argued below. She may meet her burden "either through evidence of disparate treatment or by showing that the employer's explanation is false or 'unworthy of credence.'" *Delaval v. Ptech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (quoting *Laxton*, 333 F.3d at 578) The evidence must be of sufficient weight that "a jury could conclude that the employer's articulated reason is pretextual." *Gross v. Carlisle Constr. Materials, L.L.C.*, No. 24-60382, 2025 WL 2427194, at *2 (5th Cir. Aug. 22, 2025)(quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, at 615 (5th Cir. 2009)); "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions." *Wallace*, 777 F. App'x at 89 (quoting *Laxton*, 333 F.3d at 579); *see January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023).

In the sections above, Dr. Anderton has referred to ample evidence for a jury to conclude that DISD's articulated reason is pretextual. Robert Abel's unsupported fixation on safety and "abuse," when such issues were never investigated, much less

substantiated, by the PSO; Chris Lyle's and Angie Gaylord's misstatements of supposed findings in the PSO; and the meteoric rise of Dr. Whitaker, all support Dr. Anderton's allegations that DISD's version of events is not worthy of credence.

Another example is the variance between the findings of the PSO Report (ROA.795-806) and the reasons given in the termination letter signed by Robert Abel. ROA.723-725.

First Bullet Point: "You were the subject of a Professional Standards Office Investigation dated November 7, 2023, that substantiated allegations against you." ROA.723.

As explained above, the PSO investigation looked into two questions or accusations – and only substantiated one of them.

Third Bullet Point: "You improperly used PowerSchool to determine where Student 1 and Student 2 attended school. You did not have a legitimate educational interest for accessing this FERPA protected information. As such, your actions were in violation of the law and District policy." ROA.723.

Even the PSO report found that it was only *to view schedules* that Dr. Anderton used PowerSchool. "Anderton violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's *schedules* in part for a personal purpose." ROA.930 (PSO Report, p. 10) (emphasis added). As director of world languages, she learned the schools the students attended

through the federally required "Home Language Surveys," completed for each student enrolling in the district, and routinely compiled by DISD. ROA.927. Her job duties included visiting schools and students who needed the support of her World Languages team, if they showed up on the Home Language Survey as students who might be in need of World Language support. ROA.1090, ROA.848-849. The information from PowerSchool simply told her Student 1's class schedule, so that she would know when he was in his World Language class (Spanish I). Even the Lyle Declaration only states that "Dr. Anderton used her District assignment to access PowerSchool to verify Student 1 and Student 2's *schedules* for a personal purpose: checking on her friends' children who were in CPS custody." ROA.782.

<u>Fifth Bullet Point (excerpt)</u>: "you made an unannounced visit to Moseley Elementary School where Student 2 attended school. . . . You visited with the principal for merely 3-5 minutes and spent the remainder of your approximately 20 minute visit in Student 2' s classroom speaking only with Student 2 and no other students." ROA.724

According to the PSO Report, however, Student 2's teacher reported that "the interaction between Anderton and Student 2 lasted approximately two minutes." ROA.991. Evidently Anderton spoke twice as long with the principal as she did with the student.

Final Bullet Point: "Your action placed both Student 1 and Student 2 in danger." ROA.724. This is the bullet point where Mr. Abel creates allegations of abuse out of whole cloth.

". . . under the guise of performing your job duties, you improperly used your title and badge to enter schools for the sole purpose of accessing Students 1 and 2." *Id.*

When Anderton entered the schools and spoke with the students she was performing job duties. During those same days, she went to another elementary school, Dorsey Elementary, which also had students who could have benefitted from Little Sponges, and went earlier in the morning to visit another student from Egypt at Conrad High School, regarding his language class placement. ROA.1108-1109. She and her team did this for students across the district.

". . . your unauthorized visits with Student 1 and Student 2 removed them from valuable class instruction time and removed you from your duties as Director of World Languages."

Student 1 was in a World Language class, which is exactly the time someone from World Languages would most appropriately speak to him, since it was about his placement in that class. She could speak with his Spanish teacher and also Student 1, without taking Student 1 out of English or science or some other instructional class that had nothing to do with World Languages. In the case of

Student 2, his class was having indoor recess. ROA.991. He was playing on the floor, not having "valuable class instruction time."

It should be noted that between the issuance on November 7, 2023, of the PSO Report and the December 12, 2023, Termination Letter, Dr. Anderton filed her lawsuit against DISD. ROA.10. Perhaps that caused Robert Abel to "beef up" the reasons which could be supported by the PSO Report. Whatever his motivations, the reasons given in the Termination Letter did not match the PSO report, just as new reasons have been given in the summary judgment declarations.

These inconsistencies present exactly the credibility issues, and the questions of intent, which are the province of the jury. It was error to grant summary judgment on this record.

### D. PRETEXT SUFFICIENT TO PERMIT FINDING OF AGE DISCRIMINATION UNDER THE ADEA

When "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 903 (5th Cir. 2000) (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see Reeves*, 530 U.S. at 143; *Burton*, 798 F.3d at 241. Nevertheless, "discrimination suits still require evidence of discrimination." *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000); *Kopszywa v. Home Depot USA, Inc.*, 620 F. App'x 275, 279 (5th Cir. 2015)

("[E]vidence of pretext will not always be sufficient to survive summary judgment."); *Churchill v. Tex. Dep't of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir. 2013). As explained above, the evidence regarding the huge exodus of older employees, together with the promotion of Dr. Whitaker, are sufficient in this case to raise a genuine issue of material fact for a jury to decide.

"[T]he question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiff." *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).).

Finally, the explanation given by DISD relies on its supposed layers of decisionmakers; according to DISD, the decision to terminate Dr. Anderton came only after the conclusion of the PSO investigation on November 7, 2023 (ROA.795), the recommendation by Dr. Hill and Ms. Gaylord, signed November 8-9, 2023 (ROA.933), and the subsequent meeting of the Legal Review Committee on November 15, 2023. ROA.784. Yet on October 27, 2023, before the PSO investigation was even complete, Dr. Anderton's supervisor Dr. Elena Hill sent out a tweet from her personal account with a picture showing Dr. Hill with the members Dr. Anderton's department (other than Dr. Anderton), with the message: #TeamofThree:

1 13 480



**Dr. Elena S. Hill · 10/27/23**

**Dallas ISD offers students the opportunity to learn and study languages of the world! 🌎**

**It was great to connect with the World Languages Team this morning to align our strategies to our goals. 🎯**

**#AcademicServices #DallasISD #TeamOfThree #SmallButMighty**




1 9 701

ROA.1025. At that time, Dr, Anderton was still employed by DISD as Director of World Languages. To say World Language was a three-member team ("#TeamofThree") suggests that Dr. Hill was already aware, or had already ensured, that Dr. Anderton would be terminated. Dr. Hill attempts to explain this tweet away in her declaration, but a reasonable jury could consider this tweet to be a premature announcement of the changes coming to World Languages.

Together with the other indicia suggesting the stated reason for termination to be unworthy of credence, a jury should be permitted to determine whether DISD's reasons were pretextual.

## CONCLUSION

Taken together, DISD's evolving description of Dr. Anderton's conduct, the escalation of its stated reasons for termination beyond the PSO's findings, and the shifting policy justifications, create a genuine dispute of material fact as to whether DISD's stated reason is credible. A reasonable jury could find that explanation unworthy of credence. By adopting DISD's characterization of the record, and thereby resolving these issues itself, the district court erred in granting summary judgment.

Appellant Amy Anderton respectfully requests that this Court reverse the judgment below and remand this case for trial.

SUBMITTED BY:

*/s/ Stefanie M. Klein*
Stefanie M. Klein 11565650
Frank Hill 09632000
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222
(817) 274-9724 fax
sklein@hillgilstrap.com
fhill@hillgilstrap.com

ATTORNEYS FOR APPELLANT
AMY ANDERTON

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, a copy of the foregoing Brief was served on all counsel of record through the court's electronic filing system.

*/s/ Stefanie M. Klein*
Stefanie M. Klein

# CERTIFICATE OF COMPLIANCE

Appellant certifies that this document complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,079 words. It also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared on a proportionally spaced typeface using Times New Roman in 14 font size.

*/s/ Stefanie Klein*
Stefanie Klein