**No. 25-11351**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Amy Anderton,**

***Plaintiff-Appellant,***

***v.***

**Dallas Independent School District,**

***Defendant-Appellee.***

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:23-CV-2696

# BRIEF OF APPELLEE DALLAS INDEPENDENT SCHOOL DISTRICT

K. Adam Rothey
State Bar No. 24051274
arothey@thompsonhorton.com

Kathryn E. Long
State Bar No. 24041679
klong@thompsonhorton.com

Emily C. Adams
State Bar No. 24131209
eadams@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard St., Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendant-Appellee Dallas Independent School District*

## CERTIFICATE OF INTERESTED PERSONS

The number and style of this case is: *Amy Anderton, Plaintiff-Appellant v. Dallas Independent School District, Defendant-Appellee,* No. 25-11351, in the United States Court of Appeals for the Fifth Circuit.

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Plaintiff-Appellant**:
   Amy Anderton

2. **Defendant-Appellee**:
   Dallas Independent School District

3. **Counsel for Plaintiff-Appellant**:
   Stefanie M. Klein
   Frank Hill
   HILL GILSTRAP, P.C.
   1400 West Abram Street
   Arlington, Texas 76013

4. **Counsel for Defendant-Appellee**:
   K. Adam Rothey
   Kathryn E. Long
   Emily C. Adams
   THOMPSON & HORTON LLP
   500 North Akard Street, Suite 3150
   Dallas, Texas 75201

*/s/ Adam Rothey*
K. ADAM ROTHEY
*Attorney of Record for Defendant-Appellee Dallas Independent School District*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Dallas Independent School District ("Dallas ISD" or the "District") believes that oral argument is not necessary. This appeal involves the dismissal of claims under Federal Rule of Civil Procedure 56. The questions before the Court involve the routine application of well-settled law governing Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 (the "ADEA"). Because the legal arguments are adequately presented in the briefs, the decisional process would not be significantly aided by oral argument. If, however, the Court determines that oral argument would be beneficial, Dallas ISD stands ready and requests to participate.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS ........................................ ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... viii

JURISDICTIONAL STATEMENT ......................................................... xi

ISSUES PRESENTED ............................................................................ 1

STATEMENT OF THE CASE .............................................................. 2

I. Statement of Relevant Facts ........................................................ 2

A. Anderton's employment with Dallas ISD during the 2023-2024 school year. ........................................................ 2

B. In late September 2023, Anderton uses her District position and access to District resources to locate and furtively visit two students (Student 1 and Student 2) during school hours, who are her friends' children and who she knows are in CPS custody. .................. 2

1. Anderton visits Student 1 and encourages Student 1 to use her personal cell phone to speak with his biological father despite District policy and CPS prohibitions against her actions and Student 1's own warnings that he was not allowed to do so. ................................. 4

2. Anderton visits Student 2 and misrepresents the purpose of her visit on District records. .................. 7

C. Foster Mother finds out about Anderton's actions and complains to CPS and the District. ....................................... 8

D. The District investigates Foster Mother's complaints and substantiates that Anderton violated District policies when she used her District assignment to locate and meet with Student 1 and Student 2 for non-District purposes and allowed Student 1 to use her personal cell phone to contact his father during instructional time and outside of CPS supervision................ 9

E. Based on the findings and conclusions of the District's investigation, Anderton's supervisor recommends her termination to the District's Legal Review Committee, which independently evaluates the evidence and decides to terminate Anderton's at-will employment based on her violations of policy. .................................................. 16

F. After Anderton's termination, the District implemented a Central Staff Reduction Initiative, which eliminated and consolidated numerous central staff positions, including the Director of World Languages position previously held by Anderton................................................ 19

II. The District Court Proceedings .................................................... 21

A. Anderton filed her Third (and final) Amended Complaint after agreeing to voluntarily dismiss certain claims. .......... 21

B. The District filed its Motion for Summary Judgment, which the district court granted after oral argument.......... 21

SUMMARY OF THE ARGUMENT ..................................................... 22

ARGUMENT AND AUTHORITIES ..................................................... 24

I. Summary judgment should be affirmed because Anderton did not establish a prima facie case of either age or race discrimination. ....................................................................... 24

A. Overview of the prima facie standard under Title VII and the ADEA. .................................................................... 24

B. Anderton did not produce evidence to establish a prima facie case of age or race discrimination at summary judgment. .......... 26

1. Dallas ISD did not replace Anderton. .......... 27

2. Dallas ISD did not treat Anderton differently than similarly situated younger persons or those of another race. .......... 32

II. Dallas ISD articulated legitimate, nondiscriminatory reasons for Anderton's termination, and Anderton did not raise a genuine issue of material fact regarding whether the District's stated reasons for her termination were a pretext for race or age discrimination. .......... 33

A. Anderton has not created a genuine issue of material fact on the issue of pretext to maintain a race discrimination claim. .......... 35

1. The undisputed evidence shows the District's ultimate decisionmaker, the LRC, had a reasonable belief that Anderton violated District policies and terminated her for that reason, without regard to her race. .......... 37

2. Dallas ISD's reasons for terminating Anderton were consistent and did not "shift" over time. .......... 42

3. Anderton's other claimed "variances" also do not call into question whether the District reasonably believed she had violated District policy and terminated her for that reason and not her race. .......... 47

B. Anderton has not created a genuine issue of material fact on the issue of pretext to maintain an age discrimination claim. .......... 53

C. Anderton's anecdotal allegations of race and age discrimination fail to create a genuine issue of material fact regarding pretext because they are not supported

by evidence and do not, in any event, show similar treatment to persons similarly situated to Anderton. ......... 57

1. Anderton did not submit any evidence that Dallas ISD forced out older, White employees. .......... 57

2. Even if Anderton had produced evidence that Dallas ISD had let go of some older, White employees at or around the time of her termination, such anecdotal evidence would not create a genuine issue of material fact regarding whether Dallas ISD terminated her because of her age or race. ................. 60

CONCLUSION AND PRAYER ............................................................ 63

CERTIFICATE OF SERVICE ............................................................ 65

CERTIFICATE OF COMPLIANCE .................................................... 66

# TABLE OF AUTHORITIES

## Cases

*Byers v. Dall. Morning News, Inc.*,
209 F.3d 419 (5th Cir. 2000) ........ 24

*Chamblee v. Miss. Farm Bureau Fed'n*,
551 F. App'x 757 (5th Cir. 2014) ........ 36

*Creaghe v. Albemarle Corp.*,
98 F. App'x 972 (5th Cir. 2004) ........ 31

*Davis v. Dall. Area Rapid Transit*,
383 F.3d 309 (5th Cir. 2004) ........ 24

*Griffin v. Kennard Indep. Sch. Dist.*,
567 F. App'x 293 (5th Cir. 2014) (per curiam) ........ 30

*Hurt v. Ecolab, Inc.*,
No. 3-05-CV-1508-BD, 2006 WL 1947791 (N.D. Tex. July 13, 2006) ........ 46

*Kelly v. Costco Wholesale Corp.*,
632 F. App'x 779 (5th Cir. 2015) ........ 36

*King v. Dogan*,
31 F.3d 344 (5th Cir. 1994) ........ 30

*Lawson v. Graphic Packaging Int'l, Inc.*,
549 F. App'x 253 (5th Cir. 2013) ........ 61

*Lee v. Kan. City S. Ry. Co.*,
574 F.3d 253 (5th Cir. 2009) ........ 25

*McDonnell Douglas Corporation v. Green*,
411 U.S. 792 (1973) ........ 24

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
934 F.3d 447 (5th Cir. 2019) ........ 30

*Meeson v. Bd. of Regents of Tex. S. Univ.*, No. 03-20361, 2003 WL 22391313 (5th Cir. Oct. 20, 2003) (per curiam) .......... 30

*Okoye v. Univ. of Tex. Hou. Health Sci. Ctr.*, 245 F.3d 507 (5th Cir. 2001) .......... 25

*Rexses v. The Goodyear Tire & Rubber Co.*, 401 F. App'x 866 (5th Cir. 2010) .......... 31

*Rios v. Rossotti*, 252 F.3d 375 (5th Cir. 2001) .......... 24

*Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315 (5th Cir. 2021) .......... 26, 34

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) .......... 55

*Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 F. App'x 343 (5th Cir. 2011) (per curiam) .......... 34

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) .......... 24

*Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212 (5th Cir. 2001) .......... 34, 36

*Williams v. CVS Pharmacy, Inc.*, No. 1:10-CV-156, 2012 WL 3150780 (E.D. Tex. Aug. 2, 2012), *aff'd sub nom. Williams v. CVS*, 536 F. App'x 454 (5th Cir. 2013) .......... 46

*Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296 (5th Cir. 2000) .......... 61, 62

**Statutes**

28 U.S.C. § 1291 .......... xi

28 U.S.C. § 1331 .......... xi

Age Discrimination in Employment Act of 1967 (ADEA),
29 U.S.C. §§ 621 *et seq*. ........................................................... *passim*

Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e *et seq*. ....................................................... *passim*

**Other Authorities**

FED. R. CIV. P. 56 .........................................................................iii

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Senior Judge Sidney A. Fitzwater of the Northern District Court of Texas issued his Memorandum Opinion and Order on November 18, 2025 (the "Opinion"), which granted Dallas ISD's Motion for Summary Judgment. ROA.1152–64.[1] That same day, the district court entered a Judgment dismissing Anderton's suit with prejudice. ROA.1165. Anderton timely filed her notice of appeal on December 15, 2025. ROA.1176–79. This Court has jurisdiction under 28 U.S.C. § 1291.

---

1 Citations to "ROA" refer to the Record on Appeal. Citations to "Br." refer to Appellant's brief.

## ISSUES PRESENTED

1. Did the district court correctly determine that Anderton did not satisfy her burden of proving a prima facie case of race and age discrimination because she produced no evidence that she was replaced by someone outside her protected groups or that Dallas ISD treated her less favorably than other similarly situated employees outside her protected groups?

2. Did the district court correctly determine that, even if Anderton had met her burden of proving a prima facie case of race discrimination, she did not meet her burden of producing evidence that would enable a reasonable jury to find that Dallas ISD's legitimate, nondiscriminatory reasons for her termination were pretextual and that race was a motivating factor in her termination?

3. Did the district court correctly determine that, even if Anderton had met her burden of proving a prima facie case of age discrimination, she did not meet her burden of producing evidence that would enable a reasonable jury to find that Dallas ISD's legitimate, nondiscriminatory reasons for her termination were pretextual and that age was the but-for cause of her termination?

# STATEMENT OF THE CASE

## I. Statement of Relevant Facts

### A. Anderton's employment with Dallas ISD during the 2023–2024 school year.

During the 2023–2024 school year, Dallas ISD employed Amy Anderton, a sixty-year-old, White individual, as the Director for the District's Department of World Languages ("World Languages"). ROA.364–65, 516 ¶ 6. World Languages was a department under the District's Academic Services Department ("Academic Services"). ROA.938–39 ¶ 3. At the time, Anderton's immediate supervisor was Dr. Elena Hill, one of two Deputy Chiefs of Academic Services. ROA.938–39 ¶ 3.

### B. In late September 2023, Anderton uses her District position and access to District resources to locate and furtively visit two students (Student 1 and Student 2) during school hours, who are her friends' children and who she knows are in CPS custody.

Shortly before the COVID shutdown, Anderton, an advanced German speaker, developed a personal relationship with a native German couple, husband CC and wife SV. ROA.775−76 ¶ 17, 1073, 17:7−23, 1088, 114:5−18. CC and SV "were close friends of [Anderton's]." Br. 3, 7. CC and SV had several children, who were also personally

familiar with Anderton. ROA.775–76, ¶ 17. CC and SV homeschooled their children. ROA.775–76, ¶ 17, 853.

In early September 2023, the Texas Department of Family and Protective Services Child Protective Services Division ("CPS") removed CC and SV's children from their home due to concerning allegations regarding conduct by CC and SV. ROA.775–76 ¶ 17. Among the children were two brothers, one high school aged (Student 1) and the other elementary school aged (Student 2), who were placed with a foster mother ("Foster Mother"). ROA.770–71 ¶ 6. While in foster care, CPS enrolled the two brothers in Dallas ISD schools. *Id*. Student 1 enrolled at H. Grady Spruce High School ("Spruce"). ROA.770–71 ¶ 6, 795. Student 2 enrolled at Nancy Moseley Elementary School ("Moseley"). ROA.770–71 ¶ 6, 795.

Based on her review of District resources, Anderton learned that Student 1 and Student 2 had been enrolled in Dallas ISD schools. ROA.1090, 135:18–136:3, 1107, 227:16–23, 775–76 ¶ 17. Anderton then accessed District information and determined that Student 1 was at Spruce and Student 2 was at Moseley. ROA.1090, 135:18–136:17, 775–76 ¶ 17. Anderton further accessed District information regarding the students' schedules and determined where they would be at any given

time during the school day from the District's PowerSchool database. ROA.1090, 135:25–136:17, 775−76 ¶ 17. Using this information, and without informing CPS, her supervisor, or anyone at Spruce or Moseley, Anderton set out to visit Student 1 and Student 2 at their respective schools on September 26 and 27, 2023. ROA.1090, 135:25–136:17, 775−76 ¶ 17.

#### 1. Anderton visits Student 1 and encourages Student 1 to use her personal cell phone to speak with his biological father despite District policy and CPS prohibitions against her actions and Student 1's own warnings that he was not allowed to do so.

Anderton visited Student 1 at Spruce on September 26, 2023. ROA.801. Anderton brought German candy with her to give to Student 1. ROA.802, 1091, 137:11–18. Anderton signed in at Spruce using her District badge and listed the "Person(s) Visited" as "LOTE," or "languages other than English." ROA.803, 832, 1091, 137:21–138:1. But Anderton did not have an appointment to meet with anyone at Spruce when she signed in. ROA.776 ¶ 19. Instead, Anderton went directly to Student 1's classroom. ROA.776 ¶ 20. Anderton knew Student 1 would be in Spanish class at the time she arrived because she had checked his schedule in PowerSchool. ROA.1090, 136:4–17. When Anderton arrived

at the classroom, she asked the teacher if she could speak with Student 1 in the hallway. ROA.776–77 ¶ 20, 829.

Anderton immediately learned from Student 1 that he was performing well in Spanish. ROA.1090, 136:18–22, 1106, 222:21–223:4. As the Director of World Languages, Anderton admits she no longer had any educational purpose for speaking with Student 1 after she verified his proper placement in Spanish. ROA.1106, 223:2–8, 223:12–14. But Anderton did not end her conversation with Student 1 after verifying his placement in Spanish. Instead, she remained in the hallway with Student 1 for approximately thirty minutes as reflected on security footage. ROA.777–78 ¶ 21.

Anderton claims she and Student 1 talked about concerns related to his foster situation as well as a medical issue. ROA.1086, 107:8–12, 1088, 114:5–18, 778 ¶ 22, 781–82 ¶ 28. Anderton claims she had a tough time understanding the medical terminology in German. ROA.1088, 114:5–18, 781–82 ¶ 28. As a result, Anderton offered to let Student 1 use her personal cell phone to call his father. ROA.1088, 114:5–18, 781–82 ¶ 28. District policy prohibits personal use of cell phones by employees during instructional time. ROA.583. Anderton routinely signed policy

acknowledgments indicating her familiarity with Dallas ISD policies. ROA.526 ¶ 30, 677–84. Not only did Anderton know that using her personal cell phone for personal reasons during instructional time violated policy, Student 1 also informed her that he was not allowed to speak to his parents except under CPS supervision or supervision by his Foster Mother, or else, in his mind, they might go to jail. ROA.1087, 111:17–112:2, 1090, 135:12–17. Despite her knowledge of District policy, Student 1's warning, and common sense, Anderton encouraged Student 1 to use her cell phone to talk to his father. ROA.782 ¶ 29, 853–54.

Student 1 spoke with his father for approximately fifteen minutes. ROA.777–78 ¶ 21, 803. Anderton was present for most of the conversation, but at one point she left Student 1 completely unsupervised on her cell phone while she walked around a corner. ROA.777–78 ¶ 21, 858, 1087–88, 112:22–113:6. Anderton admits that she did not hear everything Student 1 said to his father while on her cell phone.[2] ROA.1087–88, 112:22–113:6, 1108, 230:19–231:7.

[2] Anderton admits that she visited Student 1 at school and permitted him to speak on her phone with his biological father, her good friend, who she knew was being investigated by CPS. Br. 3−4, 7.

Anderton did not speak with any other students while at Spruce. ROA.776–77 ¶ 20, 844. Anderton did not inform anyone at Spruce of her visit with Student 1 other than the teacher, and she did not even inform the teacher of the nature of her conversation with Student 1. Indeed, in a brief conversation Anderton had with a Spruce assistant principal on her way out of the building, she informed him that she had visited Spruce to provide support to a foreign language substitute teacher. ROA.776–77 ¶ 20, 837. She did not mention her visit with Student 1.

#### 2. Anderton visits Student 2 and misrepresents the purpose of her visit on District records.

On September 27, 2023, Anderton signed in at Moseley indicating that the purpose of her visit was to meet with the "principal." ROA.778–79 ¶ 23, 834. Anderton did not have an appointment with the principal. ROA.820. Instead, she went directly to Student 2's classroom, where she spent ten to fifteen minutes speaking exclusively with Student 2. ROA.778–79 ¶ 23, 820–21. Anderton attempted to meet with the principal after her visit to Student 2's classroom, but the principal was busy, so they only spoke for a few minutes before Anderton left Moseley. ROA.778–79 ¶ 23, 820. Anderton did not inform the principal of her visit with Student 2.

### C. Foster Mother finds out about Anderton's actions and complains to CPS and the District.

In a conversation with Student 2 after school on September 27, Foster Mother learned of Anderton's visit to Moseley. ROA.773 ¶ 12, 818. Foster Mother then asked Student 1 whether Anderton had visited him as well, which Student 1 denied. ROA.773 ¶ 12, 819. Foster Mother did not believe Student 1. Out of concern for the safety of Student 1 and Student 2 and her own family, Foster Mother contacted Moseley Principal Carmen Derrick and Spruce Principal Francine Taylor to report the visits, and also reported Anderton's conduct through the District's EthicsPoint complaint system. ROA.770−71 ¶¶ 6–7, 787−92, 942−43 ¶ 14, 961−63.

Foster Mother reported her concern that Anderton "used her job to locate and check on the children," avoiding the CPS approval process for visitation and otherwise creating a risk of relaying confidential information, such as Foster Mother's address and where the students attended school, to the parents. ROA.770−71 ¶¶ 6–7, 788. Foster Mother explained that Anderton was a close family friend of Student 1 and Student 2's parents and that their parents previously made a request to CPS that Anderton have access to the children during family visits; a

request CPS denied. ROA.770−71 ¶ 6, 773−74 ¶ 13, 788, 818. Foster Mother intended to file a grievance "to ensure Anderton has no contact with Student 1 or Student 2" because she was "worried about her and her children's safety." ROA.797.

### D. The District investigates Foster Mother's complaints and substantiates that Anderton violated District policies when she used her District assignment to locate and meet with Student 1 and Student 2 for non-District purposes and allowed Student 1 to use her personal cell phone to contact his father during instructional time and outside of CPS supervision.

Due to the serious nature of the allegations against Anderton and the need to investigate, on September 28, 2023, the District's Employee Relations department, part of Human Capital Management ("HCM"), placed Anderton on administrative leave with pay. ROA.517 ¶ 8, 546−49. The District's Professional Standards Office ("PSO") also initiated an investigation into the allegations against Anderton. ROA.772−73 ¶¶ 10–11. PSO Investigator Chris Lyle led the investigation and drafted the resulting Report of Investigation (the "ROI"). ROA.772–73 ¶ 11, 794–858.

PSO investigated whether Anderton violated District policy by (1) using her District assignment to locate and meet with Student 1 and Student 2 for non-District purposes or (2) relaying confidential

information to Student 1 and Student 2's parents. ROA.772 ¶ 10, 796. PSO considered whether Anderton had violated her ethical duties outlined in policy DH (Exhibit), which states that an "educator shall not use institutional or professional privileges for personal or partisan advantage." ROA.685, 796. Therefore, PSO considered *inter alia* whether Anderton had located and met with Student 1 and 2 for a non-District or personal purpose or advantage in violation of District policy. ROA.780−81 ¶ 26. PSO also evaluated Anderton's conduct in light of District policy DH (Regulation), regarding the proper use of cellular phones, and the CQ policy series regarding proper use of access to District technology resources. ROA.796.

As part of the investigation, PSO spoke with sixteen witnesses—including witnesses from CPS, Moseley, Spruce, and World Languages—and obtained evidence including sign-in logs, surveillance footage, emails, and text messages. ROA.772 ¶ 10. As outlined in the ROI, PSO did not substantiate that Anderton relayed confidential information to Student 1 and Student 2's parents. ROA.780 ¶ 25, 804. However, PSO did substantiate numerous violations of policy by Anderton, including that Anderton "used her District assignment to access PowerSchool to

verify Student 1 and Student 2's schedules in part of a personal purpose." ROA.804. PSO also concluded that Anderton violated District policy by allowing Student 1 "to use a cell phone, which is prohibited during instructional time in the District." ROA.804. PSO also concluded that "Anderton allowed Student 1 to converse with someone that neither the District nor CPS had approved for unsupervised visitation." ROA.804.

The twelve-page ROI, supported by fifty-eight pages of evidence, contained extensive fact-based findings supporting PSO's conclusions regarding Anderton's violations of District policy. ROA.795–858. For example, PSO found that Anderton "knew Student 1 and Student 2's parents and that [CPS] was involved in the students' care before her … campus visit[s]." ROA.795. Indeed, Anderton admitted to PSO that she "partly visited [Student 1] because of her friendship with the family." ROA.801. Student 2 also told Foster Mother that Anderton personally identified herself as his "mom and dad's friend" when she visited him at Moseley, thereby gaining Student 2's trust. ROA.796. Moreover, Foster Mother and CPS reported to PSO that CPS had *denied* Anderton access to the students during family visits only five days before she made the

visits to Spruce and Moseley, evidencing her awareness that she could not meet with the students outside of CPS supervision. ROA.796−97.

PSO's investigation further found that Anderton used her District access to PowerSchool, her badge, and District position to locate and speak with Student 1 and Student 2. Anderton admitted to PSO that when she learned the students were enrolled in Dallas ISD, which she determined by reviewing a District Home Language Survey that she had access to by virtue of her position, she accessed PowerSchool to look up their schedule information. ROA.801. PSO also found that Anderton used her District credentials to access to District facilities "to meet with Student 1 and Student 2" at their campuses without having to "disclose the purpose of her visits" to the administration at either campus. ROA.795, 803–04. For example, PSO found that Anderton concealed her intent to visit Student 1 and Student 2 by signing in at Spruce and Moseley stating deceptive reasons for her visits. *See* ROA.803, 832, 834. Moreover, Student 1's Spanish teacher only let Anderton in his classroom because he knew she was a District employee and that she "is over [Languages other than English]" for the District. ROA.798. Similarly,

Student 2's teacher only let Anderton in her classroom because Anderton was wearing a District badge. ROA.801.

PSO also found that Anderton "used her District assignment to remove Student 1 from class," provided him a personal "gift" of candy she specifically brought for him, and "allowed the student to talk to his parents on her cellular phone [during instructional time in violation of District policy DH (Regulation)] after the student informed her that he was not supposed to talk to them." ROA.795, 804. Indeed, Anderton admitted to PSO that Student 1 informed her that he was not allowed to speak to his parents outside of CPS supervision. ROA.802. PSO also found that Anderton told Spruce counselor Traci Smith that allegations against her friends were "false" and that the family would be reunited "soon." ROA.799. Anderton further attempted to conceal her involvement by telling the Spruce counselor not to mention her name if referring him for mental health services Student 1. ROA.799.

PSO's investigation refuted Anderton's claims that she visited Student 1 and Student 2 for District purposes. For example, Anderton told the Spruce assistant principal that she was visiting Spruce to help a substitute teacher. ROA.799. But PSO's investigation revealed that

Anderton only visited Student 1's Spanish class and in fact told the teacher, Jose Rubio, that she "had little time" and only wanted to speak with Student 1. ROA.798–99. Brenda Draper, another Spruce Spanish teacher interviewed by PSO, stated she "had never known Anderton to speak to students during her visits." ROA.799. Francine Taylor, Spruce's principal, told PSO that she did not believe Anderton's visit to Student 1 was District-related because she would have asked to speak with Student 1 in a room, not in the hallway. ROA.799. Anderton also had no appointment with Spruce's principal. ROA.799.

Anderton also claimed that the purpose of her visit to Spruce was to speak with Student 1 about his Spanish enrollment, which she asserted was a District purpose. ROA.802. But Anderton admits that after finding out that Student 1 was doing fine in his Spanish class that she had no educational purpose for the remainder of her visit. ROA.1106, 222:21–223:14. Moreover, Anderton admitted to PSO that her reasons for allowing Student 1 to talk to his parents on her cell phone were to "mitigate" the parent's anxieties and to support Student 1's "emotional well-being," which had nothing to do with his Spanish enrollment. ROA.802. Thus, PSO found that "[t]he 15-minute conversation Anderton

allowed Student 1 to have with his family during instructional time, and the gift she admittedly provided him indicates Anderton's intended purpose for visiting [Student 1] was, in part, to circumvent the CPS process." ROA.795, 804.

Regarding Student 2, Anderton claimed to PSO that she visited Moseley to discuss the possibility of expanding a foreign language elementary school program. ROA.802. However, the Moseley principal told PSO that Anderton showed up unannounced, visited with her for only three to five minutes, and did not visit any classrooms other than Student 2's classroom. ROA.800. Student 2's teacher also noticed Anderton only spoke to Student 2. ROA.801.

Anderton's supervisor, Dr. Hill, informed PSO that she did not see any District reason for Anderton to have visited the students specifically, give them gifts, or allow them to use her personal cell phone. ROA.801. And despite Anderton's contention that she was at the campuses for District purposes, "[s]chool administrators did not learn that Anderton … used her District assignment to access Student 1 and Student 2 during instructional time until the student's foster parent contacted CPS and inquired with District officials about Anderton's … contact with the

students." ROA. 795. Thus, PSO substantiated that Anderton "violated District policy [DH (Exhibit)] when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules in part for a personal purpose." ROA.804. The ROI also indicated that Anderton's provision of her cell phone to Student 1 during instructional time violated District policy DH (Regulation). ROA.804.

### E. Based on the findings and conclusions of the District's investigation, Anderton's supervisor recommends her termination to the District's Legal Review Committee, which independently evaluates the evidence and decides to terminate Anderton's at-will employment based on her violations of policy.

Under Dallas ISD policy and procedure, an employee's immediate supervisor prepares a letter administratively recommending personnel action to the District's Legal Review Committee ("LRC").[3] ROA.520

[3] Dallas ISD's LRC serves as the Superintendent's designee to review documentation for potential personnel action, such as terminations, suspensions, demotions, and other employee discipline. ROA.519–20 ¶ 14, 584. The LRC is composed of representatives from Dallas ISD's HCM, Staffing, School Leadership, Operations, and Legal Services departments (although Legal Services representatives do not participate in voting). ROA.519–20 ¶ 14, 584. The LRC meets weekly and reviews and evaluates recommendations for personnel action and the supporting documentation submitted. ROA.521 ¶ 18. The LRC decides what personnel action, if any, the District will take. ROA.521 ¶ 18. The LRC may change, concur, deny, amend, or remand the recommendation of the supervisor after review. ROA.521 ¶ 18. The LRC conducts its own independent evaluation of the recommended personnel action and determines whether the recommended action coincides with the documented misconduct. ROA.521 ¶ 18. The LRC often changes the administrator's recommendation to a different disciplinary action or to a lesser or

¶¶ 16–17. Therefore, Employee Relations asked Dr. Hill to prepare an administrative recommendation regarding employment action based on the outcome of the PSO investigation. ROA.947 ¶ 25, 519 ¶ 13.

On November 9, 2023, Dr. Hill recommended to the LRC that the District terminate Anderton's at-will employment (the "Recommendation"). ROA.947 ¶ 26, 997, 521–22 ¶ 20, 579–85, 685–87. Dr. Hill recommended termination solely based on the "substantiated findings from the investigation that the employee violated district policy, specifically DH (Exhibit) and DH (Regulation)." ROA.947 ¶ 26, 997. Dr. Hill's immediate supervisor, Chief Angie Gaylord ("Chief Gaylord"), signed the Recommendation concurring with Dr. Hill's recommendation. ROA.909 ¶ 10, 933.

At a November 15, 2023 meeting, the LRC considered Dr. Hill's Recommendation and the supporting documentation (including the ROI and attached Exhibits). ROA.522–23 ¶¶ 21–23, 551, 586–676, 772–73 ¶ 11, 795–858. The LRC independently reviewed and evaluated the information in the supporting documentation and focused on the ROI and its Exhibits, including the witness statements and Anderton's own

more severe disciplinary action. ROA.521 ¶ 18.

statements. ROA.523 ¶ 24, 551, 586–676, 772–73 ¶ 11, 795–858. The LRC was greatly concerned about the serious danger Anderton placed Student 1 and Student 2 in by interfering in a CPS investigation and allowing unauthorized, and unsupervised contact between Student 1 and his biological father. ROA.523–25 ¶¶ 25–27.

After independently reviewing the information in the ROI and attached exhibits, the LRC voted unanimously to terminate Anderton's employment with the District. ROA.526–27 ¶ 31. On December 12, 2023, Dallas ISD terminated Anderton's employment via a letter outlining the bases for the termination decision. ROA.530–31 ¶ 39, 723–25. In addition to the policy violations substantiated in the ROI, the LRC also found that Anderton's actions violated District policies FL (Legal and Local), which prohibit access to student records unless the employee has a "legitimate educational interest" in the records. ROA.528–29 ¶ 33, 694–95, 712, 725. This determination by the LRC was based on PSO's finding that Anderton had accessed the students' information in PowerSchool information contained in PSO's investigative materials that demonstrated that Anderton's job responsibilities did not involve working directly with students. ROA.528–29 ¶ 33.

### F. After Anderton's termination, the District implemented a Central Staff Reduction Initiative, which eliminated and consolidated numerous central staff positions, including the Director of World Languages position previously held by Anderton.

After Anderton's termination, her duties as Director of World Languages were temporarily assumed by Anne-Lauren Marrs, a White employee over forty and the then-Director of Reading Language Arts under Academic Services. ROA.911 ¶ 16, 949 ¶ 33. Then, in early 2024, months after Anderton's termination, Chief Gaylord restructured Academic Services as result of budget constraints in a District-wide restructuring effort called the Central Staff Reduction Initiative ("CSRI"). ROA.911 ¶ 16, 537–38 ¶ 55.

As part of the restructuring, the District eliminated all seven director positions in Academic Services, and their functions were consolidated into three newly created director positions. ROA.911 ¶ 16. All existing directors were released from their positions and permitted to reapply for the three consolidated positions. ROA.911 ¶ 16. In particular, the restructuring eliminated Anderton's vacant Director of World Languages position as well as a Director of STEM, Health, and Physical Education position held at the time by Dr. Lisa Whitaker, an

approximately 45-year-old, African American female. ROA.911 ¶ 16, 1029–30 ¶¶ 2–3. Chief Gaylord's restructuring of Academic Services consolidated the work of World Languages and STEM, Health, and Physical Education into an entirely new department called Electives and Enrichment. ROA.911–12 ¶¶ 16–17, 1010–11 ¶¶ 10–11.

Dr. Whitaker, among others, applied for the new Director of Electives and Enrichment position. ROA.1010–11 ¶ 11, 1034–35 ¶ 16. Dr. Michelle Broughton, a Deputy Chief in Academic Services supervised directly by Chief Gaylord, vetted applications for the new positions and ultimately recommended Dr. Whitaker to Chief Gaylord for the position. ROA.1010–11 ¶ 11. Chief Gaylord interviewed Dr. Whitaker to assess her strengths, leadership style, and knowledge of legal and local policies, and ultimately agreed with the recommendation and hired Dr. Whitaker as the Director of Electives and Enrichment, effective April 2024. ROA.912–13 ¶ 19.

## II. The District Court Proceedings

### A. Anderton filed her Third (and final) Amended Complaint after agreeing to voluntarily dismiss certain claims.

After multiple rounds of motions to dismiss, Anderton and the District reached an agreement whereby Anderton would dismiss some of

her claims in exchange for the District agreeing to answer a narrowed Third Amended Complaint. ROA.322−25. On September 20, 2024, the district court accepted Anderton's Third Amended Complaint (the "Complaint"), which asserted only age and race discrimination claims under the ADEA and Title VII. ROA.364−400. On September 27, 2024, the District answered the Third Amended Complaint. ROA.401−17.

### B. The District filed its Motion for Summary Judgment, which the district court granted after oral argument.

On June 20, 2025, the District filed its Motion for Summary Judgment and Brief and evidence in support. ROA.454−1116. When briefing was completed, the District Court set the District's Motion for Summary Judgment for hearing on October 22, 2025. ROA.1151.

On November 18, 2025, the District Court granted Dallas ISD's Motion for Summary Judgment and entered its Judgment dismissing Anderton's claims with prejudice. ROA.1152−64, 1165. Anderton filed her Notice of Appeal on December 15, 2025. ROA.1176−79.

## SUMMARY OF THE ARGUMENT

Dallas ISD did not discriminate against Anderton because of her race or age. Dallas ISD terminated Anderton's employment because she violated District policies when she used her District position and access

to District resources to locate and visit Student 1 and Student 2 during school hours for non-District or personal purposes, in circumvention of the CPS process. The students were children of Anderton's friends who she knew were in CPS custody. During one of the visits, Anderton violated District policies when she pulled Student 1 out of class time, provided him with her cell phone, and allowed him to call his father, despite the fact that she knew Student 1 was not allowed to speak with his parents outside of CPS supervision.

Anderton does not deny that she visited the students. Indeed, she does not dispute many of the underlying facts. Instead, she disputes whether the District terminated her for these reasons as opposed to her age and race. But Anderton submitted no evidence of her own in response to the District's Motion for Summary Judgment. Rather, her argument that her age and race—not her violations of District policy—were the real reasons for her termination is premised in large part on what she claims are inconsistencies between the findings of the PSO investigation and the District's stated reasons for her termination. Anderton also points to the post-termination restructuring in her former department that resulted

in the hiring of a younger, Black employee to a position that oversaw some of her old duties as evidence of pretext.

But Anderton did not even establish a prima facie case of race or age discrimination. Anderton presented no evidence that she was replaced by someone younger or of a different race, or otherwise show that the District terminated her because of her race or age. Rather, the uncontroverted evidence shows that Dallas ISD eliminated Anderton's position after her termination due to District-wide restructuring.

Anderton has also not created a genuine issue of material fact on the issue of pretext because she does not—and cannot—cite evidence that the ultimate decisionmaker (the LRC) did not reasonably believe that she violated District policy and terminated her for that reason. Any alleged inconsistencies between the PSO's investigative findings and the LRC's stated reasons for her termination are in fact not inconsistencies at all. And even if they were, they do not create any genuine issue of material fact regarding the District's reasons for her termination. Thus, the district court's summary judgment decision should be affirmed.

## ARGUMENT AND AUTHORITIES

### I. Summary judgment should be affirmed because Anderton did not establish a prima facie case of either age or race discrimination.

#### A. Overview of the prima facie standard under Title VII and the ADEA.

Anderton does not dispute that there is no direct evidence of discrimination in this case. ROA.1157. Under such circumstances, courts use the burden-shifting framework from *McDonnell Douglas Corporation v. Green* to analyze Title VII and ADEA employment discrimination claims. 411 U.S. 792 (1973); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007) (race discrimination). Under that framework, the plaintiff must first produce evidence of a prima facie case of discrimination. *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000). If and only if they can do so, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse treatment.[4] *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). If the defendant does so, the burden then shifts

---

[4] While the burden of production shifts, the burden of persuasion always remains with the plaintiff. *Rios v. Rossotti*, 252 F.3d 375, 379 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

back to the plaintiff to prove that the proffered reason was pretext for discrimination. *Rios*, 252 F.3d at 379.

To establish a prima facie case of disparate treatment based on race under Title VII, Anderton must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she was the subject of an adverse employment action, and (4) she was replaced by someone outside her protected group or treated less favorably because of her membership in that protected class than were other similarly situated employees who were not members of the protected class under nearly identical circumstances. *See Okoye v. Univ. of Tex. Hou. Health Sci. Ctr.*, 245 F.3d 507, 512–14 (5th Cir. 2001); *see also Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)).

Similarly, to establish a prima facie case of age discrimination under the ADEA, Anderton must demonstrate that (1) she was within the protected class at the time of the challenged action, (2) she was qualified for the position she held or applied for, (3) Dallas ISD terminated her, and (4) (i) she was replaced by someone outside the protected class, (ii) she was replaced by someone younger, or (iii) the

termination was otherwise because of her age. *See Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321–22 (5th Cir. 2021).

### B. Anderton did not produce evidence to establish a prima facie case of age or race discrimination at summary judgment.

Anderton's prima facie argument rests almost entirely on her claim that the District replaced her with Dr. Whitaker, a younger, African American employee. But Anderton did not meet her burden of proving a prima facie case of race or age discrimination because the only summary judgment evidence in the record conclusively shows that Dallas ISD did not replace Anderton at all. On the contrary, the District eliminated Anderton's World Languages director position, along with the positions of many other Central Staff employees (including Dr. Whitaker's), months after her termination as part of the CSRI. The District then rehired Dr. Whitaker to an entirely new position. Anderton also produced no evidence (or even argument) that the District treated her differently than employees outside her protected classes under nearly identical circumstances.

### 1. Dallas ISD did not replace Anderton.

At the time of her termination, Anderton was one of seven directors in the District's Academic Services Department. ROA.911 ¶ 16. About seventy District employees worked in Academic Services at the time. ROA.911 ¶ 16. As the Director of World Languages, Anderton supervised three District employees. ROA.951 ¶ 37. Immediately after Anderton's December 2023 termination, responsibility for supervising World Languages shifted temporarily to Anne-Lauren Marrs, who was the then-Director of Reading and Language Arts in Academic Services, and who Anderton does not dispute is a White woman over forty like herself. ROA.911 ¶ 16, 1142.

Around the time of Anderton's termination, Dallas ISD was facing significant budget constraints. ROA.538 ¶ 55. As a result, months after Anderton's termination, the District implemented the CSRI, which resulted in the elimination of numerous central staff positions in the District in multiple departments. ROA.538 ¶ 55. As part of the CSRI, Chief Gaylord restructured all of Academic Services' sub-departments, including World Languages. ROA.911 ¶ 16. The restructuring resulted in the consolidation of all sub-departments in Academic Services into just

three new sub-departments.[5] ROA.911 ¶ 16. This consolidation meant that the number of director positions in Academic Services—like the one previously held by Anderton—dropped from seven to three. ROA.911 ¶ 16. The restructuring also resulted in reducing Academic Services staff numbers from roughly seventy to thirty. ROA.911 ¶ 16.

Because the CSRI eliminated all prior sub-departments, all existing directors were let go from their positions of those now nonexistent sub-departments. ROA.911 ¶ 16. This included Dr. Whitaker, the Director of the STEM, Health and Physical Education department in Academic Services at the time of Anderton's termination and at the time of the restructuring. ROA.911 ¶ 17. Indeed, the restructuring eliminated Dr. Whitaker's Director position at the same time it eliminated the World Languages Director position previously held by Anderton. ROA.911–12 ¶ 17.

Thus, Dr. Whitaker never held the position of Director of World Languages. ROA 911 ¶ 17. Instead, after the elimination of Dr. Whitaker's department, she applied for the director position over the

[5] The three newly created sub-departments were called Electives and Enrichment, Visual and Performing Arts Elementary, and Visual and Performing Arts Secondary. ROA.911 ¶ 16.

newly created Electives and Enrichment department. ROA.912 ¶ 18. And Chief Gaylord, a fifty-one-year-old White woman, hired Dr. Whitaker for that new position in May 2024. ROA.912 ¶ 19, 906 ¶ 2.

Chief Gaylord offered unrebutted testimony that "Dr. Whitaker did not replace Anderton as the Director of World Languages. The Director of World Languages position was eliminated … as part of the restructuring of Academic Services," after Anderton's termination. ROA.913 ¶ 20. Moreover, under Chief Gaylord's restructuring, Electives and Enrichment consolidated responsibilities from several eliminated departments, including many of Dr. Whitaker's prior responsibilities as Director of STEM, Health and Physical Education, as well as some responsibilities previously handled by Anderton as Director of World Languages. ROA.912 ¶ 18.

The foregoing unrebutted evidence conclusively demonstrates that Dallas ISD did not replace Anderton with Dr. Whitaker. Rather, the uncontradicted and unobjected-to evidence shows that months after Anderton's termination, due to a District-wide budgetary restructuring and reorganization, the District eliminated Anderton's World Languages Director position and hired Dr. Whitaker to a newly created position that

encompassed many responsibilities not covered by Anderton's former position. And Anderton has produced no evidence from which a reasonable jury could find that Dallas ISD replaced her with Dr. Whitaker under these circumstances.[6] *See Meeson v. Bd. of Regents of Tex. S. Univ.*, No. 03-20361, 2003 WL 22391313, at *2 (5th Cir. Oct. 20, 2003) (per curiam) (finding a reasonable jury could not find plaintiff was "replaced" by alleged comparator even where alleged comparator assumed similar job responsibilities months after plaintiff's termination, since evidence demonstrated that plaintiff's job was eliminated after his termination due to university-wide reorganization); *see also Griffin v. Kennard Indep. Sch. Dist.*, 567 F. App'x 293, 294–95 (5th Cir. 2014) (per

---

[6] At most, Anderton's Brief refers to an undated, purported screenshot of a Dallas ISD website that allegedly depicts Dr. Whitaker as a "Director" over "Electives and Enrichment," supervising two World Languages employees. Br. 21. But Anderton did not submit or prove up that screenshot as part of the summary judgment record. Rather, her Record citation to the purported screenshot shows she included it only in her Third Amended Complaint. *Id.* (citing ROA.368). But unverified allegations in a complaint are not competent summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). Regardless, even if the screenshot were competent summary judgment evidence, all it shows is what Dallas ISD's evidence already proves: Dr. Whitaker became the director over the newly created Electives and Enrichment department. Moreover, given the fact that Chief Gaylord, a 51-year-old White woman, oversaw the restructuring of Academic Services and was responsible for hiring Dr. Whitaker, it seems highly unlikely that she did so in order to discriminate against an older White woman in Anderton. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460–61 (5th Cir. 2019) (holding that "on numerous occasions, this court has held that discrimination is less likely when the supervisor is in the same protected class as the plaintiff").

curiam) (a plaintiff "has not been 'replaced' … when [her] former duties are distributed among other co-workers"); *Rexses v. The Goodyear Tire & Rubber Co.*, 401 F. App'x 866, 868 (5th Cir. 2010) (plaintiff not replaced where duties were distributed among coworkers and record showed "that there were a number of material differences" between the job duties at issue); *Creaghe v. Albemarle Corp.*, 98 F. App'x 972, 975–76 (5th Cir. 2004) (plaintiff not replaced by employee who held position that required job skills that plaintiff did not possess and included job responsibilities beyond those covered by plaintiff's former position).

Anderton argues that Dallas ISD's restructuring evidence "does not automatically defeat [her] 'replacement' argument." Br. 21. She cites no controlling authority in support. Rather, Anderton cites a single, unpublished case from the Northern District of Mississippi—*Bogan v. MTD Consumer Group, Inc.*—that she claims stands for the proposition that a "totality of circumstances" can create a fact issue regarding whether a plaintiff has met her prima facie burden. Br. 22. But *Bogan* did not involve a restructuring like that which occurred after Anderton's termination. No. 17-60697, 2016 WL 3671696, at *2 (N.D. Miss. July 1, 2016). Indeed, *Bogan* acknowledges that cases involving restructurings,

like *Griffin*, did not apply to its fact pattern. Thus, Anderton has presented no evidence or even persuasive authority contravening the District's evidence and authority that summary judgment was appropriate due to her failure to raise a material fact issue to establish a prima facie case of discrimination based on having been replaced by someone younger or of another race.

#### 2. Dallas ISD did not treat Anderton differently than similarly situated younger persons or those of another race.

Anderton's Brief does not appear to argue that she proved a prima facie case of age or race discrimination by showing that she was treated less favorably than other similarly situated employees outside her protected groups. Even if it did, Anderton did not present any evidence from which a reasonable jury could conclude that Dallas ISD treated her differently than others outside her protected classes under nearly identical circumstances to otherwise meet her prima facie burden. Br. 22.

At most, Anderton claims she "was aware" that Dallas ISD purportedly "phased out" "over a dozen other older women—most of whom were white"—as part of restructuring initiatives. Br. 7 (citing ROA.500). But Anderton does not cite summary judgment evidence in

support of these claims. Rather, she cites Dallas ISD's summary judgment briefing and supporting evidence, which demonstrated only that the people Anderton claims were "phased out," all either retired or resigned, did not hold positions similar to her, and were not the subject of PSO investigations for misconduct like she was. Br. 7 (citing ROA.500).

In sum, Anderton can cite no evidence suggesting that she was treated differently than similarly situated individuals under nearly identical circumstances. Moreover, failing to create a genuine issue of material fact regarding whether Dallas ISD replaced her with a younger person of a different race, Anderton did not meet her burden of proving a prima facie case of either age or race discrimination, and summary judgment is proper.

## II. Dallas ISD articulated legitimate, nondiscriminatory reasons for Anderton's termination, and Anderton did not raise a genuine issue of material fact regarding whether the District's stated reasons for her termination were a pretext for race or age discrimination.

Even if Anderton had met her burden to show a prima facie case of race or age discrimination—which she did not—the district court properly granted summary judgment because Dallas ISD articulated a legitimate, nondiscriminatory reason for her termination. As the district

court correctly concluded—and Anderton's Brief does not dispute—Dallas ISD produced evidence of a legitimate, nondiscriminatory reason for Anderton's termination: she violated District policies. ROA.526–29 ¶¶ 30–34, 1161; *see also Ross*, 993 F.3d at 324 (finding that violations of district policies, including working on outside projects during work hours and not being truthful to district officials, are legitimate, nondiscriminatory reasons for termination); *Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346 (5th Cir. 2011) (per curiam) (misuse of company resources, among other things, are legitimate, nondiscriminatory reasons for termination).

Having met its burden of production, any presumption of discrimination disappears, and Anderton bore the burden to produce "substantial evidence" that either Dallas ISD's proffered reason was pretextual or that her race was a motivating factor in her termination, and that her age was the but-for cause for her termination. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). Anderton did not meet her burden.

Anderton produced no evidence at summary judgment—much less "substantial evidence"—and cites no evidence in her Brief from which a

reasonable jury could determine that Dallas ISD's stated reasons for its termination are false or a pretext for discrimination. Rather, Anderton relies on immaterial, so-called inconsistencies between the findings in the ROI and the LRC's stated bases for its decision to terminate her employment, as well as the hiring of Dr. Whitaker to the newly-created Electives and Enrichment position, in support of her argument that her race or age, or both, are the real reasons for her termination. Br. 22–30. But Anderton's strained arguments regarding purported inconsistencies or so-called "shifting narratives" and evidence-free mischaracterizations of events involving Dr. Whitaker do not create genuine issues of material fact from which a reasonable jury could infer that the LRC did not reasonably believe she had violated District policies and terminate her for those reasons.

### A. Anderton has not created a genuine issue of material fact on the issue of pretext to maintain a race discrimination claim.

To defeat summary judgment on her Title VII race discrimination claim, Anderton must have produced "substantial evidence of pretext," creating a genuine issue of material fact that either (1) Dallas ISD's stated reasons for her termination are not true, but are instead a pretext

for discrimination, or (2) that Dallas ISD's reasons, while true, are only one of the reasons for its conduct and another factor is Anderton's race. *Wallace*, 271 F.3d at 220. Anderton may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. *Id.*

Anderton cites no evidence of disparate treatment in support of her pretext argument. Indeed, as HCM Chief Robert Abel testified, as a "long-standing member of the [LRC], [he is] not aware of any District personnel who have remained employed by Dallas ISD" after engaging in conduct similar to Anderton's. ROA.536 ¶ 52. Consequently, Anderton is left to argue only that the District's reasons for her termination are false or unworthy of credence. *See Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 784 (5th Cir. 2015).

Importantly, "[this Court's] analysis of whether an alleged violation of an employer's policy is a pretext for discrimination does not turn on whether the employee in fact violated the policy, but rather whether the employer reasonably believed the employee violated the policy and acted based on that belief." *Chamblee v. Miss. Farm Bureau Fed'n*, 551 F. App'x 757, 760 (5th Cir. 2014) (citing *Waggoner v. City of Garland, Tex.*, 987

F.2d 1160, 1165 (5th Cir. 1993)). Anderton acknowledges as much in her Brief. Br. 13 (citing *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020)). But Anderton neither produced nor identified any competent summary judgment evidence that Dallas ISD did not believe that she violated District policies and terminated her on that basis.

#### 1. The undisputed evidence shows the District's ultimate decisionmaker, the LRC, had a reasonable belief that Anderton violated District policies and terminated her for that reason, without regard to her race.

The uncontroverted evidence shows that the LRC, as the ultimate decisionmaker, did not consider Anderton's race when it voted to terminate her employment. ROA.529 ¶ 34. Anderton presents no evidence that the LRC even knew her race when it considered her termination recommendation. Indeed, Anderton's race was not discussed anywhere in the ROI or its attached exhibits. *See* ROA.587–676. The uncontroverted evidence further conclusively establishes that the LRC reasonably believed that Anderton had violated District policy and terminated her for those reasons alone.

It is undisputed that the ultimate decision maker regarding Anderton's termination was the LRC. ROA.521 ¶ 18, 536 ¶ 51, 584. The

LRC independently reviews and evaluates recommendations for personnel action and materials submitted in support of the recommendation. ROA.521 ¶ 18. The LRC does not "rubber-stamp" recommendations. ROA.521 ¶ 18. The LRC can vote for a different personnel action than the one recommended. ROA.521 ¶ 18.

It is further undisputed that the LRC received and reviewed Dr. Hill's recommendation that Anderton be terminated. ROA.521–22 ¶ 20. And Dr. Hill recommended termination based solely on the PSO's substantiation in the ROI that Anderton had violated District policies, including DH (Exhibit) and DH (Regulation). ROA. 947–48 ¶¶ 26–28, 909–10 ¶¶ 10–13.

As part of the LRC's evaluation of Dr. Hill's recommendation, they received and reviewed a packet of supporting documentation. ROA.522–23 ¶¶ 21–22. The documents reviewed included, among other things, the ROI and all its exhibits. ROA.522–23 ¶ 22. Based on the LRC's review of these materials, it reasonably understood that PSO had substantiated that Anderton used "her District assignment to locate and meet with Student 1 and Student 2 for non-District purposes," in violation of DH (Exhibit). ROA.523 ¶ 24. The LRC's decision to terminate Anderton was

premised on this finding: Anderton had used her District position and access to District information "for her own personal interests: to facilitate contact between the Students and their parents outside of CPS's supervision." ROA.523–24 ¶ 25.

Indeed, it is undisputed that based on the LRC's independent review of the ROI and supporting evidence, the LRC "found … that Anderton used District time and resources to allow Student 1 to speak with a person that CPS was actively investigating," despite the fact that Anderton knew Student 1 was in CPS custody and further despite the fact that Student 1 had explicitly told her he was not allowed to talk to his parents outside of CPS supervision. ROA.524–25 ¶ 27. Unsurprisingly, the LRC believed that Anderton's conduct placed Student 1 and Student 2 in danger, as well as the students and staff at their respective schools, because by "opening an unauthorized channel of communication" between Student 1 and his father, Anderton opened the door to Student 1 disclosing his school or foster location during an ongoing CPS investigation, which could have led to contentious, or even violent confrontations.[7] ROA.525 ¶ 27.

---

[7] Anderton claims Abel's "fixation on safety and 'abuse,' when such issues were

As part of its independent review of the packet of materials supporting the termination recommendation, the LRC also independently concluded that Anderton's conduct as outlined in the ROI violated additional policies, including FL (Legal) and FL (Local), regarding access to student information and records. ROA.527 ¶ 31. Specifically, the LRC determined—based on their independent review of the ROI and exhibits—that Anderton did not have a "legitimate educational interest" in accessing Student 1 and Student 2's records in PowerSchool since she accessed them in order to facilitate her visits with the Students, which were for a personal, not District purpose. ROA.528–

never investigated," is evidence of pretext. Br. 23–24. That Anderton would describe the LRC's concern about the students' "safety" and the potential for further "abuse" as a pretextual "fixation," only supports, not contradicts, the District's stated bases for her termination. CPS does not remove children from their parents' custody unless there are allegations of child abuse or neglect. *See* https://www.dfps.texas.gov/child_protection/ ("[CPS] becomes involved with children and families when they are referred by the DFPS Investigations division, which investigates allegations of child abuse and neglect."). Thus, while PSO may not have specifically investigated whether Anderton's actions placed the students in danger, it is common sense that they did. Indeed, the whole reason Foster Mother complained is because of concerns for her and her family's safety. Therefore, it is reasonable for the LRC to be concerned about student safety in the context of Anderton's employment in an industry entirely focused on the development and well-being of children. Moreover, as part of the PSO's investigation, Anderton claimed that Student 1 may suffer from depression and could benefit from a "referral to Mental Health Services … ." ROA.799. Why someone who claims to be concerned about a child's mental health would surreptitiously place the child in direct, unsupervised contact with their potentially abusive or neglectful parent is beyond comprehension.

29 ¶ 33. Abel outlined the LRC's findings and reasons for terminating Anderton in her termination letter. ROA.530–31 ¶ 39, 723.

The LRC's reasonable belief that Anderton had violated District policies and should be terminated for that reason is further supported by the uncontroverted evidence of Anderton's admissions to PSO that: (1) she used District resources (PowerSchool and the Home Language Survey) to access information that would help her meet with Student 1 and Student 2 during their school and her work hours (ROA.801); (2) she pulled Student 1 out of class during instructional time and allowed Student 1 to use her personal cell phone to call his father (ROA.802); (3) she knew Student 1 was in CPS custody at the time (ROA.802); Student 1 told her he was not allowed to speak to his parents outside of CPS supervision at the time she offered her cell phone for his use (ROA.851); (4) she gave Student 1 candy that she had specifically bought for him knowing she intended to visit him in school (ROA.849); and (5) she had no educational purpose in talking to Student 1 after she determined his placement in Spanish was appropriate (ROA.1106, 222:21–223:14).[8]

---

[8] Dr. Hill also told PSO that Anderton "generally worked with instructors, not students," and that she did not see "a reason for Anderton enter an elementary school classroom to converse with a student, give a student an item, or allow a student to

The LRC's reasonable belief that Anderton violated District policies is also supported the evidence considered by the LRC that: (1) she "violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules in part for a personal purpose" (ROA.804); (2) District policy DH (Exhibit), the Educators' Code of Ethics, prohibits educators from using "institutional or professional privileges for personal or partisan advantage" (ROA.685); (3) District policy prohibits making personal calls during instructional time[9] (ROA.583); and (4) District policy prohibits accessing student information except for legitimate educational purposes (ROA.694). Anderton, on the contrary, cites no evidence calling into question whether the LRC reasonably believed she had violated policy and terminated her for that reason.

### 2. Dallas ISD's reasons for terminating Anderton were consistent and did not "shift" over time.

Because the uncontroverted evidence shows that Dallas ISD reasonably believed Anderton violated District policies and terminated

use her cellular phone." ROA.801.

[9] District policy DH (Regulation) applies to the use of cell phones in school buildings by District employees. ROA.583. It prohibits employees from making or receiving personal calls during instructional time. ROA.583.

her for those reasons alone, Anderton is left to nit-pick at so-called "variance[s]" or "shifting accounts" between the findings of the ROI and the reasons for her termination outlined in her termination letter as evidence that the District's reasons for her termination are false or unworthy of credence. Br. 13–14, 24–27. But Anderton's arguments fail to show any material shift in the District's reasons for her termination.

Primarily, Anderton takes issue with the District's characterizations of how she violated District policy DH (Exhibit), Standard 1.4, which prohibits the use of "institutional or professional privileges for personal or partisan advantage." ROA.685. But, as the district court correctly expressed, the District's characterization of her conduct as being for her "personal gain," "personal benefit," or "personal advantage," are merely slightly different ways of saying the same thing: that she used her institutional privileges (*i.e.*, access to schools and information concerning the Students via her District position) for non-District purposes (*i.e.*, her own personal purposes) in violation of multiple District policies. *See* ROA.1199−200, 18:24−19:21.

Relatedly, Anderton complains that the District has provided no "rational explanation for how Anderton's actions were for her 'personal

gain,' 'personal benefit,' or 'personal advantage.'" Br. 14. Again, this argument ignores the uncontroverted evidence. As PSO Investigator Chris Lyle testified and the uncontroverted evidence shows, Anderton "used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules for a personal purpose: checking on her friends' children who were in CPS custody and facilitating unauthorized and supervised communications between Student 1 and his biological father," which violated DH (Exhibit), the Educators' Code of Ethics. ROA.780–81 ¶ 26. This testimony is entirely consistent with the conclusion of the ROI that Anderton "violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules in part for a personal purpose" of allowing Student 1 "to use a cell phone, which is prohibited during instructional time in the District, … to converse with someone that neither the District nor CPS had approved for unsupervised visitation." ROA.804.

Not surprisingly, the ROI's findings and conclusions underpinned the LRC's independent, but obviously consistent determination that Anderton had used "her District assignment to locate and meet with Student 1 and Student 2 for non-District purposes [in violation of] DH

(Exhibit).” ROA.523 ¶ 24. Namely, that Anderton had abused “her District position and access for her own personal interests: to facilitate contact between the Students and their parents outside of CPS’s supervision.” ROA.523 ¶ 25. In line with that determination, the District notified Anderton that it was terminating her employment because she “improperly used PowerSchool to determine where Student 1 and Student 2 attended school,” without a “legitimate educational interest” as evidenced by the fact that used that information to “visit with Student 1” and “allow[ ] Student 1 to use your personal cell phone to hold an approximately 15-minute unsupervised conversations with his father, which was prohibited due to the active CPS investigation.” ROA.723.

Thus, nothing shifted in the District’s position between the ROI and the LRC: Anderton violated District policies DH (Exhibit) and FL (Legal and Local) when she used District resources and her District position to locate and gain access to students for personal reasons and without a legitimate educational interest. In fact, the findings in the ROI wholly support the District’s stated bases for her termination as outlined in the termination letter. And any slight differences in how the District described her conduct—whether for personal gain, personal benefit, or

personal advantage—are merely slightly different ways of saying the same thing and do not raise a genuine issue of material fact as to whether the District reasonably believed she had violated District policy and terminated her for that reason, as opposed to her race. *See Williams v. CVS Pharmacy, Inc.*, No. 1:10-CV-156, 2012 WL 3150780, at *14 (E.D. Tex. Aug. 2, 2012), *aff'd sub nom. Williams v. CVS*, 536 F. App'x 454 (5th Cir. 2013) ("Once an employer has provided a nondiscriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be material.") (internal citations omitted; cleaned up); *Hurt v. Ecolab, Inc.*, No. 3-05-CV-1508-BD, 2006 WL 1947791, at *6 (N.D. Tex. July 13, 2006) ("[S]ubtle differences in the reasons given to justify an adverse employment action do not create a fact issue for trial. Rather, plaintiff must show that the shifting explanations are 'directly contradictory' or otherwise sufficient to permit a reasonable factfinder to infer pretext.").

### 3. Anderton's other claimed "variances" also do not call into question whether the District reasonably believed she had violated District policy and terminated her for that reason and not her race.

Anderton parses the language of the termination letter to identify what she claims are other "variances" between the findings of the ROI and the stated reasons for termination. Br. 24–27. Once again, these so-called "variances" are not variances at all, or at least not more than merely minor discrepancies that do not cast any doubt on the District's reasons for terminating Anderton.

First, Anderton quibbles with the language in her termination letter stating that she was "the subject of a [PSO] investigation … that substantiated allegations [plural] against you" (ROA.723), as opposed to the conclusions in the ROI that did not substantiate the singular "accusation" that Anderton "relayed confidential information to the student's parents" (ROA.804). Br. 24. While it is correct that the ROI ultimately endeavored to answer two questions regarding Anderton's conduct, it cannot be said that in the process, it only substantiated a singular "allegation" against Anderton. Indeed, no reasonable jury could review the eight pages of "Factual Findings" in the ROI and determine

that PSO did not substantiate numerous allegations against Anderton. *See* ROA.796–804.

For example, the ROI explicitly found that Anderton violated District policy when she "allowed [Student 1] to use a cell phone, which is prohibited during instructional time in the District." ROA.804. And while the ROI did not expressly set out to answer this question, it is undisputed that Anderton did provide Student 1 with a cell phone during instructional time, which the ROI found was a violation of District policy. ROA.804 ("Anderton gave Student 1 an unverified item(s) and allowed him to use a cell phone, which is prohibited during instructional time in the District"); 583 ("Personal calls [using cellular phones] may not be made or received during instructional time."). Therefore, this alleged "variance" is nothing more than a minor discrepancy and fails to raise a fact issue about whether the LRC reasonably believed that Anderton had violated the District policies and acted on that belief.[10]

[10] This complaint might hold water if LRC in fact relied on the unsubstantiated conclusion that Anderton had provided confidential information to the biological parents as a basis for terminating her. But it did not, and Anderton has no evidence that it did. Nowhere in the termination letter does it reference the unsubstantiated accusation that Anderton allegedly "related confidential information to the student's parents." *See* ROA.723–25. At most Anderton argues that Abel's testimony that he believed she had "interfered in a CPS investigation" shows reliance on the unsubstantiated finding that she had shared confidential information with the

Next, Anderton takes issue with the termination letter's statement that she "improperly used PowerSchool to determine where Student 1 and Student 2 *attended school*" (ROA.723, emphasis added), whereas the ROI found that she used PowerSchool to "verify [the students'] *schedules*" (ROA.804, emphasis added). Br. 24. In making this argument, Anderton concedes that the ROI correctly concluded that the "information [she accessed] from PowerSchool … told her Student 1's class schedule," which she then used "for a personal purpose: checking on her friends' children who were in CPS custody." Br. 24–25 (citing ROA.782). The critical issue then is whether the LRC reasonably believed that Anderton used PowerSchool to access student information for a personal, as opposed to educational purpose. But that is exactly what the ROI substantiated. ROA.804. Thus, it is immaterial whether the information she improperly accessed was where the students attended school versus what their class

Students' parents. Br. 17. But Abel never stated that he believed Anderton had shared confidential information with the students' parents. All Abel stated is that he is not aware of anyone who "remained employed by Dallas ISD after utilizing their District position to interfere with a CPS investigation." ROA.536 ¶ 52. That statement has nothing to do with whether Anderton shared confidential information, and is instead entirely supported by the findings in the ROI that Anderton's provision of a cell phone Student 1 to allow him to talk with his parents outside of CPS supervision "indicates Anderton's intended purpose for visiting Spruce HS was, in part, to circumvent the CPS process." ROA.795.

schedules were. And Anderton provides no argument as to why this immaterial variance is evidence that the LRC's reason for her termination was false and pretext for her race.

Anderton's next complaint—about the length of time she reportedly spent visiting with Student 2 as Moseley—suffers from the same deficiency—it at most presents a semantic "variance" but not a material discrepancy to raise a fact issue that the LRC did not believe she violated District policy and did not act on that belief. Anderton complains that the termination letter indicates that her visit to Student 2's school consisted of a "3-5 minute" visit with the principal with the remainder of her time spent in Student 2's classroom, whereas Student 2's teacher reported to PSO that Anderton spent about two minutes directly interacting with Student 2. Br. 25 (citing ROA.724, 991). Anderton's assertion is inaccurate. Student 2's teacher told PSO that Anderton was in her classroom for "10 to 15 minutes," two of which were spent directly talking to Student 2 and no other student. ROA.801. Student 2's principal also told PSO that Anderton came to her school "unannounced" and spent "3 to 5 minutes" visiting with the principal. ROA.800. Thus, the evidence gathered in the ROI reveals an "approximately 20 minute" visit to the

school, including three to five minutes spent with the principal, and the remainder of the time spent in Student 2's classroom, where she only spoke directly with Student 2 and no other student. ROA.724.

But even if this somehow showed a discrepancy, Anderton again fails to explain how the discrepancy creates an issue of fact regarding whether the LRC reasonably believed she violated District policy and acted based on that belief. The primary violation of policy identified by the LRC was her use of District resources to locate the students for personal reasons. As the ROI found, Anderton visited Student 2's school unannounced, without an appointment, and spent the majority of her time visiting Student 2's classroom and talking with Student 2 and no other student. The ROI further found that while Anderton signed in indicating her intent to visit the principal, she in fact had no appointment with the principal and spent the majority of her visit in Student 2's classroom. ROA.800, 803. PSO concluded based on this evidence that she accessed Student 2's information and went to see him for personal, not District reasons. *Id.* The LRC reasonably accepted this finding, which constituted a policy violation. Anderton fails to explain how any minor discrepancy in the description of the details of her visit raises a fact issue

about whether the LRC reasonably believed that her actions violated District policy and terminated her for that reason as opposed to her race.

Lastly, Anderton complains about the termination letter's language that she placed the students "in serious danger" by circumventing the CPS investigation process. Br. 26 (citing ROA.724). This purported variance from the ROI's findings is immaterial and not evidence that the LRC did not reasonably believe that she violated District policy and terminated her for that reason. Anderton admitted to PSO that she knew the students were in CPS custody when she visited them and that she knew they were not allowed to visit with their parents while the CPS investigation proceeded. ROA.802. The ROI reflects that the Foster Mother expressed concern that Anderton's actions might have compromised her address, which is supposed to remain confidential to protect the safety of the foster family in what is certainly a highly emotionally charged situation involving children removed from their home. *See* ROA.797. Indeed, the ROI indicates that Anderton told a counselor that she thought Student 1 had depression and could potentially be referred for mental health services. ROA.799. Moreover,

CPS only gets involved in removing children from their parents' custody when there is suspected abuse or neglect.[11]

Based on this information, the LRC could reasonably conclude that Anderton's actions placed the students in danger, either from further potential abuse by their parents or additional emotional trauma. In short, while the ROI might not have specifically used the word "danger," drawing such a conclusion from the ROI's factual findings is reasonable and not evidence that the LRC did not reasonably believe that Anderton had violated District policy and terminate her for that reason. Thus, the foregoing so-called "variances" do not create genuine issues of material fact regarding whether the District's stated reasons for Anderton's termination were a pretext for race discrimination.[12]

### B. Anderton has not created a genuine issue of material fact on the issue of pretext to maintain an age discrimination claim.

In support of her argument that Dallas ISD's stated reasons for her termination are a pretext for age discrimination, Anderton relies on:

---

11 *See* https://www.dfps.texas.gov/child_protection/.

12 Although she does not advance these arguments in her Brief, nothing about Anderton's arguments raised in support of her race discrimination claim and addressed in Section II.A. raise a genuine issue of material fact about alleged age discrimination either.

(1) her allegations—unsupported by evidence—of "the [so-called] huge exodus of older employees;" (2) Dr. Whitaker's hiring to the newly-created Electives and Enrichment director position; and (3) a social media post by Dr. Hill while Anderton was on administrative leave that did not reference Anderton. Br. 27–30. None of these evidence-free arguments create a genuine issue of material fact as to whether Dallas ISD reasonably believed Anderton violated District policy and terminated her for that reason as opposed to her age.

Anderton did not produce any summary judgment evidence of a "huge exodus of older employees" from Dallas ISD. At most, Anderton merely *alleged* in her Complaint that "older" employees were let go as part of the CSRI. But Anderton did not produce any evidence, and there is no evidence in the summary judgment record, supporting a claim that the CSRI disproportionately affected "older" employees. And even if there were, as will be further discussed below (*see* Section II.C), evidence of alleged discrimination against others not similarly situated to Anderton is not evidence of pretext regarding Anderton's termination.

Next, Dr. Whitaker's hiring by Chief Gaylord, a fifty-one-year-old White woman, to the newly created Electives and Enrichment Director

position months after Anderton's termination is entirely irrelevant to the question of whether the LRC reasonably believed Anderton had violated District policy and terminated her on that basis. As discussed, Chief Gaylord was not a member of the LRC and played no role in the LRC's independent evaluation of Anderton's conduct and decision to terminate her. ROA.910–11 ¶ 15. Moreover, there is no evidence that any member of the LRC played any role in the reorganization of Academic Services under the CSRI or Dr. Whitaker's subsequent hiring to the Electives and Enrichment Director position. Thus, Chief Gaylord's decision to hire Dr. Whitaker to a newly created position months after Anderton's termination does not create an issue of fact regarding whether the *LRC* reasonably believed Anderton had violated District policies and terminated her for that reason as opposed to her age. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226–27 (5th Cir. 2000) (only proper to impute discriminatory attitudes of employees to the ultimate decisionmaker if they had influence or leverage over the official decisionmaker).

Finally, Anderton's reference to a social media post by Dr. Hill does not create an issue of fact regarding the LRC's reasons for terminating

Anderton. As with Chief Gaylord, Dr. Hill was not a member of the LRC and, beyond her recommendation to the LRC, played no role in the LRC's independent evaluation of Anderton's conduct and decision to terminate her. ROA.948–49 ¶ 31. Thus, Dr. Hill's social media post—which merely highlighted the District's World Languages program and team (*see* ROA.951 ¶ 37, 1005)—is wholly irrelevant to the question of whether the *LRC* reasonably believed that Anderton had violated policy and terminated her for that reason as opposed to her age. Moreover, the unrebutted evidence demonstrates that Dr. Hill did not have the authority to terminate Anderton and that Dr. Hill's social media post did not evidence any intent by Dr. Hill to recommend Anderton's termination. ROA.951 ¶ 37.

Thus, none of Anderton's purported evidence create a genuine issue of material fact regarding whether her age was the but-for reason for the LRC's decision to terminate her.

### C. Anderton's anecdotal allegations of race and age discrimination fail to create a genuine issue of material fact regarding pretext because they are not supported by evidence and do not, in any event, show similar treatment to persons similarly situated to Anderton.

In a final attempt to salvage her race and age discrimination claims, Anderton's Brief repeatedly references allegations that she was just one of a number of so-called "older" "white" employees whose employment with Dallas ISD ended at or around the same time as hers. *See* Br. 3, 14–16, 28. Anderton asserts that this alleged "environment" existing around the time of her termination raises a genuine issue of material fact on the issue of pretext. But Anderton is wrong on the facts as well as the law. Anderton produced no evidence—and indeed cites none in her Brief—that shows an environment of terminating "older, White" employees at the time of her termination. And even if she had evidence of such an environment, it is irrelevant because she also produced no evidence—and cites none in her Brief—showing that any of those individuals released by Dallas ISD were similarly situated to her.

#### 1. Anderton did not submit any evidence that Dallas ISD forced out older, White employees.

At the outset, it is important to clarify that Anderton's allegations of a so-called "environment" where Dallas ISD "shed" numerous "older"

"white" employees are just that—allegations not supported by evidence. Instead, Anderton relies solely on Dallas ISD's summary judgment evidence to support her argument that Dallas ISD supposedly had a pattern or practice of forcing out older, white employees. But Dallas ISD's summary judgment evidence says nothing of the sort.

By way of background, Anderton alleged in her Complaint that "four white women in their late fifties/early sixties who were directors … have since been forced out—either fired or pushed to retire earlier than they had planned … ." ROA.327–28 ¶ 3.4. Anderton provided the names of those women in her Complaint. ROA.327–28 ¶ 3.4. Anderton's Complaint further alleged that additional "older women," whom she also identified by name, "were also removed," and replaced by "younger," non-White individuals. ROA.328 ¶ 3.5. But Anderton did not produce any evidence supporting these allegations in discovery or in response to Dallas ISD's motion for summary judgment.

At summary judgment, Dallas ISD attempted to short circuit Anderton's allegations that it had some sort of pattern or practice of terminating older, White employees, by introducing evidence that none of the employees identified by Anderton were terminated or otherwise

similarly situated to her. In so doing, Dallas ISD did not present evidence of the ages or races of the individuals identified by Anderton. Rather, Dallas ISD's evidence—consisting of four paragraphs in the Declaration of Robert Abel referred to by Anderton in her Brief (ROA.537–39 ¶¶ 55–58)—merely acknowledged that Abel "understood" that *Anderton* had "claimed" in the lawsuit that various "older, White" employees had been "forced out," but did not concede that her allegations were true. ROA.537 ¶ 55.

Moreover, Abel did not even confirm the age or race of any of the so-called "older, White" employees identified by Anderton. *See* ROA.537–39 ¶ 55–58. On the contrary, the only evidence of an employee's race contained in these paragraphs is Abel's representation that several *non*-white employees were released from their employment as part of the CSRI. ROA.538 ¶ 56 (identifying certain Black and Hispanic employees as having been released from their positions in Academic Services as part of the CSRI). Abel further offered uncontroverted testimony that *none* of the individuals identified by Anderton in her Complaint or her discovery responses were "forced out" by Dallas ISD because of their age or race. ROA.537–38 ¶ 55. On the contrary, Abel testified that only after

Anderton was terminated did Dallas ISD undergo the CSRI due to budget constraints. ROA.538 ¶ 55. Abel further contradicted Anderton's baseless allegations by pointing out that several of the individuals Anderton claims were "forced out," in fact voluntarily left the District through retirement or taking new jobs elsewhere. *See* ROA.538–39 ¶¶ 57–58. Thus, Anderton produced no evidence and cites no evidence in her Brief that numerous other "older, White" employees were "forced out" around the same time as she was terminated for violating District policy.

**2. Even if Anderton had produced evidence that Dallas ISD had let go of some older, White employees at or around the time of her termination, such anecdotal evidence would not create a genuine issue of material fact regarding whether Dallas ISD terminated her because of her age or race.**

Even if Anderton had produced evidence that Dallas ISD released numerous other "older, White" employees in or around the time of her termination—which she did not—such anecdotal evidence would not create an issue of fact regarding pretext because: (1) she produced also no evidence of a "pattern or practice" of discrimination against older, White employees by Dallas ISD; and (2) none of the employees Anderton identified were similarly situated to her.

In the ADEA context, the Fifth Circuit has held that a plaintiff "may establish that the defendant engaged in a pattern or practice of discrimination by showing 'by a preponderance of the evidence that [the impermissible] discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Lawson v. Graphic Packaging Int'l, Inc.*, 549 F. App'x 253, 256 (5th Cir. 2013). But a "pattern or practice" of discrimination does not consist of "isolated or sporadic discriminatory acts by the employer." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875 (1984)) (internal quotations omitted). Rather, "it must be established … that the impermissible discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* (cleaned up).

Additionally, "[a]necdotes about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff." *Wyvill*, 212 F.3d at 302. And employees providing "me too" testimony are only similarly situated when they experience similar adverse actions to the plaintiff. *See id.* ("In this case, the plaintiff['s] anecdotal evidence did not

involve similarly situated employees. [...] None of the former employees was terminated under circumstances similar to [plaintiff's].").

To be clear, no employee provided "me too" testimony in support of Anderton's argument that Dallas ISD had a pattern or practice of terminating older, White employees. Moreover, Anderton cannot establish by a preponderance of the evidence that race or age discrimination was Dallas ISD's standard operating procedure since the CSRI in fact resulted in the elimination of positions held by individuals of all ages and races. *See* ROA.537–39 ¶¶ 55–58.

Furthermore, none of Anderton's anecdotal allegations—even if they were supported by admissible evidence, which they are not—create an issue of material fact regarding whether Dallas ISD's reasons for terminating her are a pretext for age or race discrimination, because none of the other individuals she identifies were similarly situated to her. That is, none of the allegedly older, White employees identified by Anderton as having been impacted by the CSRI were terminated for violating District policy as she did.[13] *See* ROA.537–39 ¶¶ 55–58; *see also Wyvill*,

[13] Only if Anderton claimed she had been released under the CSRI could she even ask the Court to consider whether the simultaneous release of other "older" "White" employees at the same time evidenced discrimination. But that is not what occurred.

212 F.3d at 302 (excluding anecdotal evidence as irrelevant to the issue of age discrimination because individuals were not similarly situated where plaintiff had been terminated). For these reasons, Anderton's unsupported allegations that Dallas ISD forced out older, White employees fail to create a genuine issue of material fact regarding whether the LRC reasonably believed that she violated District policies and terminated her for that reason and not her age or race.

## CONCLUSION AND PRAYER

Therefore, the District prays that the Court affirm the district court's judgment in all respects.

Respectfully submitted,

*/s/ Adam Rothey*
K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

EMILY C. ADAMS
State Bar No. 24131209
eadams@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendant-Appellee Dallas Independent School District*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on counsel for Plaintiff-Appellant Amy Anderton on May 27, 2026 via the Court's electronic filing and service system, addressed as follows:

Stefanie M. Klein
sklein@hillgilstrap.com
Frank Hill
fhill@hillgilstrap.com
Hill Gilstrap, P.C.
1400 West Abram Street
Arlington, Texas 76013

/s/ *Adam Rothey*
K. Adam Rothey
*Attorney of Record for Defendant-Appellee Dallas Independent School District*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,993 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with a 14-point font named Century Schoolbook.

Dated: May 27, 2026

/s/ *Adam Rothey*
K. Adam Rothey
*Attorney of Record for Defendant-Appellee Dallas Independent School District*