# No. 25-11351

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

*Amy Anderton,*

Plaintiff - Appellant

v.

*Dallas Independent School District,*

Defendant - Appellee

---

**On Appeal from**
United States District Court for the Northern District of Texas
3:23-CV-2696

---

## REPLY BRIEF OF APPELLANT AMY ANDERTON

---

Stefanie M. Klein 11565650
Frank Hill 09632000
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222)
sklein@hillgilstrap.com
fhill@hillgilstrap.com

**ATTORNEYS FOR APPELLANT
AMY ANDERTON**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

**A. STANDARD OF REVIEW** ........ 1

**B. SUMMARY OF ARGUMENT** ........ 2

**C. REPLACEMENT** ........ 3

**D. PRETEXT/REASONABLE BELIEF** ........ 8

**E. INDEPENDENT REVIEW** ........ 15

CONCLUSION ........ 16

CERTIFICATE OF SERVICE ........ 18

CERTIFICATE OF COMPLIANCE ........ 18

# TABLE OF AUTHORITIES

**Cases……………………………………………………………………Pages(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................1

*Bogan v MTD Consumer Group, Inc.*,
No. 17-60697, 2016 U.S. Dist. LEXIS 86092 (N.D. Miss. Jul. 1, 2016) .............7

*Burton v. Freescale Semiconductor, Inc.*,
798 F.3d 222, 235-238 (5th Cir. 2015)................................................................13

*Ernst v. Methodist Hosp. Sys.*,
1 F.4th 333 (5th Cir. 2021)...................................................................................4

*Laxton v. Gap, Inc.*,
333 F.3d 572, 582-583 (5th Cir. 2003) ................................................................13

*Reeves v. Sanderson Plumbing Prods. Inc.,*
530 U.S. 133 (2000) ..................................................................................... 1, 3, 10

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993) ..........................................................................................10

*Tolan v. Cotton*,
572 U.S. 650 (2014) ............................................................................................1

*Wright* v. *West,*
505 U.S. 277, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992) ..................................10

**Rules**

FED. R. CIV. P. 56 ...................................................................................................1

# ARGUMENT

The central error below was in the district court's misapplication of the summary judgment standard. Under FED. R. CIV. P. 56, if a reasonable jury could disbelieve DISD's stated reasons for dismissing Dr. Anderton, summary judgment should have been denied. Instead of drawing inferences in Dr. Anderton's favor, however, as required by the applicable authority, the district court's decision accepted DISD's characterization of events. The internal inconsistencies in DISD's own evidence, and the contrary inferences supported by the summary judgment record, dictate reversal.

## A. STANDARD OF REVIEW

There is no dispute as to the summary judgment standard. The district court was required to view the evidence at summary judgment in the light most favorable to Dr. Anderton, as the non-moving party, and to neither weigh the evidence nor evaluate its credibility. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150 (2000). Instead, the court "failed to credit evidence that contradicted some of its key factual conclusions," improperly "weighing the evidence" and resolving disputed issues in favor of the moving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## B. SUMMARY OF ARGUMENT

In responding to Dr. Anderton's opening brief, DISD repeatedly avers that there was no replacement of Dr. Anderton, that there was independent review by its Legal Review Committee ("LRC"), and that the LRC's "reasonable belief" in Dr. Anderton's misconduct was established as a matter of law. All material fact issues are dismissed by DISD as quibbles, "minor discrepancies," or semantics. (DISD Br. 46, 47, 48, 50, 51). Respectfully, it was up to a jury to determine how such inconsistencies should be resolved.

Regarding replacement, the summary judgment record reflected that supervisory authority over Dr. Anderton's former World Languages staff was reassigned to a younger, African American administrator. Dr. Anderton's function was taken over by Dr. Whitaker, and there was operational continuity of the World Languages function, just under a different director. Dr. Anderton's duties were not "distributed," they were taken over by Dr. Lisa Whitaker. Whether this constituted replacement (masked by a formal "restructuring") was a question for the jury.

The purported independence of the LRC, and the "reasonable belief" of DISD decision-makers in the stated reasons for termination, are belied by the repeated overreach and contradictions in the record. The investigation's report and backup documents simply do not support the conclusions drawn by the LRC and its chair,

Robert Abel. This record would more than justify an inference of pretext to be drawn by a reasonable jury.

Finally, in disregarding the evidence of pretext, the trial court stated that "Dr. Anderton merely disputes the facts underlying her termination." ROA.1163. The dispute, however, is within DISD's own evidence. The competing inferences arise from the declarations offered by DISD, the contemporaneous witness statements gathered by DISD, the reports and correspondence from DISD, and the representations by DISD's counsel. "It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. 147 (2000). The jury would not be required to find in Dr. Anderton's favor, but it would be permitted to do so: "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

### C. REPLACEMENT

The district court accepted DISD's framing of the takeover of World Languages by Dr. Whitaker as simply a neutral restructuring, instead of permitting a jury to make a determination as to whether Dr. Anderton was replaced. Dr. Anderton's role was to supervise World Languages, and such function continued under a younger administrator outside Dr. Anderton's protected class. DISD describes Dr. Whitaker's new job as "a position that oversaw some of [Dr.

Anderton's] old duties." DISD Br. 23, 34. In reality, the position included all of Dr. Anderton's old duties, supervising the same staff Dr Anderton had supervised. The position was absorbed into a position with a new name, but it was essentially Dr. Whitaker's old job, now including Dr. Anderton's job as well.

The only reported authority cited by the district court or DISD on this issue states that distribution of a plaintiff's duties among co-workers does not constitute replacement. *See*, *e.g., Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339-40 (5th Cir. 2021). ROA.1159. This is well-settled. But Dr. Anderton's duties were not distributed among co-workers – they were put under Dr. Whitaker. Rather than state this plainly, DISD argues that "Electives and Enrichment consolidated responsibilities from *several eliminated departments* including many of Dr. Whitaker's prior responsibilities *as Director of STEM, Health and Physical Education, as well as some responsibilities previously handled by [Dr.] Anderton as Director of World Languages.* ROA.912 ¶ 18." DISD Br. 29 (emphasis added).

Dr. Whitaker, however, testifies that before Dr. Anderton's termination as Director of World Languages, Dr. Whitaker was Director of STEM Health and Physical Education in the Academic Services Department. ROA.1029. After Dr. Anderton's termination and the "restructuring", Dr. Whitaker's new job is Director of Electives and Enrichment, which supervises "health, physical education, and foreign language education." ROA.1035, ¶ 16. "Several eliminated departments"

evidently means that World Languages was no longer a separate department, and Dr. Whitaker's "STEM Health and Physical Education Department" was eliminated in the sense that it was renamed "Electives and Enrichment," and swapped out STEM for World Languages.

There is no evidence that anyone other than Dr. Whitaker is performing any of Dr. Anderton's former duties. Dr. Whitaker says she's not familiar with the image of the webpage which previously showed the world languages staff with her as director. ROA.1035, ¶ 17. *See also* DISD Br. 30, n. 6, both referring to the image at page 20 of Dr. Anderton's Brief, and in Dr. Anderton's live pleading at ROA.368.

Interestingly, despite DISD's efforts to discredit or distance itself and Dr. Whitaker from that image, the image simply confirms exactly what DISD's summary judgment evidence states – Dr. Whitaker as Director of "Electives & Enrichment," over an Instructional Coordinator of World Languages and an Instructional Specialist of World Languages.




ROA.368. This is not controversial. The only director over World Languages is Dr. Whitaker. The only director supervising the staff whom Dr. Anderton formerly supervised is Dr. Whitaker.

By her own testimony, in her thirteen years at DISD, Dr. Whitaker was a science teacher for four years, then a Campus Instructional Coach for a year, then Instructional Lead Coach for four years, and then a Project Manager III. ROA.1029, ¶ 2. As a project manager, Dr. Whitaker implemented and oversaw an office transition plan "coordinating construction schedules, electrical installments, furniture purchasing and moving, and utility installments," and doing so "within budget and in compliance with building codes and [applicable] regulations." ROA.1030, ¶¶ 4-5. After nine months as a Project Manager III, Dr. Whitaker became the Director of STEM Health and Physical Education, in the same Academic

Services Department where Dr. Anderton was Director of World Languages. ROA.1029, ¶ 2.

In short, the rise of Dr. Whitaker, culminating in her absorption of Dr. Anderton's duties, in place of her previous STEM duties, creates a fact issue as to whether or not Dr. Anderton was replaced by Dr. Whitaker. The Mississippi court in *Bogan v. MTD Consumer Group, Inc.* correctly pointed out that most of the oft cited, reported authority regarding "replacement" refers to distribution of duties, which does not apply here. No. 17-60697, 2016 U.S. Dist. LEXIS 86092 (N.D. Miss. Jul. 1, 2016). On whether an employee has been replaced, DISD also resorts to unreported authority, although from this Court rather than from a district court. DISD Br. 30-31. Thus, both sides are relying on unreported cases to address this situation, and the most appropriate approach is to examine the totality of the circumstances.

The totality of the summary judgment evidence bearing on the replacement issue includes Dr. Whitaker's history in the district, set forth above, together with the evidence that the "restructuring," which began in the first quarter of 2024, shortly after Dr. Anderton's December 2023 termination, disproportionately affected older white women; it also includes the recommendation of termination by Dr. Hill, who

had supervised Dr. Anderton for less than three months,[1] concurred with by a second level supervisor, Ms. Gaylord, who moved into her role five days before Dr. Anderton was placed on administrative leave. ROA.906, ¶ 2.[2] Since the restructuring only began after Dr. Anderton filed her discrimination lawsuit, and raised the issue of Dr. Whitaker as a comparator, the record raises fact issues regarding whether assignment of Dr. Anderton's duties was already intended when she was terminated. ROA.10 (Original Complaint filed December 8, 2023); ROA.101-102 (First Amended Complaint, filed February 28, 2024, referring to Dr. Whitaker at ¶ 4.9-4.11).

### D. PRETEXT/REASONABLE BELIEF

The district court failed to consider the variations in DISD's stated reasons for terminating Dr. Anderton as creating genuine issues of material fact for a jury. These differences were not merely semantic, as the descriptions of the reasons amplified over time, supporting the inference that DISD's decision makers never believed their initial stated reason, and decided to improve on it as they went along.

The material changes in DISD's characterization of the PSO report's findings created competing inferences as to pretext, raised issues of credibility, and

[1] Dr. Hill became Deputy Chief of Academic Services, and Dr. Anderton's boss, in July 2023. ROA.939, ¶ 4.

[2] Ms. Gaylord became Chief Academic Services Officer on September 23, 2023. Dr. Anderton was placed on administrative leave, a decision in which Ms. Gaylord "played no role," on September 28, 2023. ROA.906, ¶ 2

undermined DISD's claim of reasonable belief on the part of its decisionmakers. All of these issues are within the province of the jury. Instead, the district court accepted DISD's latest and most severe version of its reasons as established fact.

In the PSO report, Dr. Anderton was found to have accessed PowerSchool, and specifically the students' schedules, "in part for a personal purpose," and the report did not substantiate allegations of relaying confidential information about the foster parents. ROA.795, 804. Not even the suggestion of endangerment or abuse appears in the investigative document, or anywhere else until it is raised out of thin air by Robert Abel.[3]

DISD's subsequent decisions and documentation reframe the findings in progressively harsher terms, as described in Dr. Anderton's opening brief, at pages 9-11. DISD cannot controvert this, so it attempts to minimize the inconsistencies. However, the weight to be given such departures from the original investigator's report goes to credibility. This is the precise means by which the Supreme Court has held that a plaintiff can persuade a jury that the employer's explanation is pretextual:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered

[3] DISD is appalled that we pointed out the sudden focus on abuse and endangerment as pretextual. DISD Br. 39-40. Its footnote decrying this description, and claiming it lends support to DISD's reasons for termination (footnote 7, containing 215 words) exceeds even its footnote about the Lisa Whitaker screenshot (footnote 6, containing 211 words).

> reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis in original).

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See [*St. Mary's Honor Center*] at 517 ("Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright* v. *West,* 505 U.S. 277, 296, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992).

*Reeves*, 530 U.S. at 147.

DISD's witnesses, and the reasons set forth in their declarations, are rendered suspect by DISD's own documents, which in the case of Chris Lyle, the investigator, include his own prior statement. He misrepresents the findings of his own PSO report when he states that he found Dr. Anderton acted for "personal advantage," language absent from his report. As set forth on pages 9-10 of Dr. Anderton's opening brief, wording which appears nowhere in the PSO report is invoked by DISD's witnesses. From "in part for a personal purpose" becomes "for personal advantage" (ROA.780 (Lyle Decl. ¶ 26)); "for her own personal gain" (ROA.909 (Gaylord Decl. ¶ 12)); and "for the sole purpose of accessing the students." ROA.724 (Termination Letter, signed by Robert Abel).

These are not "merely slightly different ways of saying the same thing," as DISD argues. DISD Br. 43. DISD refers to the district court's question as to whether the DISD policy prohibiting use of "institutional or professional privileges for personal or partisan gain" could just mean "not really official business." ROA.1199-1200, lines 20-21. But if that were the case, why did DISD expand on its original wording? Why did the new language not just say for personal or non-District purposes? Personal advantage or gain implies selling access, profiting from use of district resources, and similar corruption. A jury could easily determine that DISD was back-filling its previous decisions, without regard to "reasonable belief," and a jury should be permitted to do so.

DISD's counsel represented to the district court that the letter terminating Dr. Anderton "stated the exact same reasons which were outlined in the PSO report." ROA.1192, lines 15-17. This is simply not true, as explained in Dr. Anderton's opening brief at pages 10-11, and 24-27. DISD gives no reason for these changes. Instead, DISD continues to embellish the record, stating that Chris Lyle's testimony

> is entirely consistent with the conclusion of the ROI that Anderton "violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules in part for a personal purpose" <u>of allowing Student 1</u> "to use a cell phone, which is prohibited during instructional time in the District, … to converse with someone that neither the District nor CPS had approved for unsupervised visitation." ROA.804.

DISD Br. 44 (emphasis added). The actual conclusion of the report never states that Anderton's personal purpose was to let a student use a cell phone during instructional time, nor that her personal purpose was to have him converse with anyone he shouldn't. Nor does any District document until its brief. Rather, the report states that

> Anderton violated District policy when she used her District assignment to access PowerSchool to verify Student 1 and Student 2's schedules in part for a personal purpose. The evidence indicates that Anderton gave Student 1 an unverified item(s) and allowed him to use a cell phone, which is prohibited during instructional time in the District. Anderton allowed Student 1 to converse with someone that neither the District nor CPS had approved for unsupervised visitation.

ROA.804. These are not subtle differences, nor are they about the underlying facts. They are solely, and significantly, about DISD's own versions of its reasons for terminating Dr. Anderton. Not what actually happened, but what DISD "reasonably believed" happened. The chart below is a timeline of DISD's "reasonable belief" about why it was firing its World Languages Director:

| Date | Source | |
|---|---|---|
| 11.07.2023 | PSO Report | Anderton violated District policy when she used her District assignment "in part for a personal purpose" ROA.804. |
| 11.08.2023<br>11.09.2023 | Recommendation of termination by Dr. Hill and Ms. Gaylord | Based on PSO Report, "employee violated district policy, specifically DH (Exhibit) and DH (Regulation)." ROA.997. |
| 11/15/2023 | LRC Meeting | One-time meeting, no questions for investigator Lyle, no changes to |

| | | |
|---|---|---|
| | | PSO Report, no follow up. ROA.784 (Lyle Decl. ¶¶ 34-35) |
| 11/16/2023 | Misconduct Reported to TEA | “The employee was accused of using her District credentials to gain access to students records and intervene in a CPS custody case” ROA.716. |
| 12/08/2023 | Lawsuit filed | Docket report, ROA.2<br>Plaintiff’s Original Complaint, ROA.10. |
| 12/12/2023 | Termination letter | “serious danger,” “possible abuse,” “alleged abusers,” “sole purpose”<br>ROA.723-725. |
| 06/09/2024<br><br>06/16/2025 | Lyle Declaration<br><br>Gaylord Declaration | “for personal advantage” ROA.780<br>“for her own personal gain” ROA.909 |

A reasonable jury could consider the timing of these descriptions, each amplifying the initial findings, and infer that DISD and its witnesses lack credibility. See *Laxton v. Gap, Inc.*, 333 F.3d 572, 582-583 (5th Cir. 2003) (jury could have reasonably concluded that employer’s proffered reason for discharge was pretextual where testimony of employer’s witnesses was not credible); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 235-238 (5th Cir. 2015) (overturning summary judgment where employers changed their reasons for termination between their EEOC position papers and the litigation: “The shift is not dramatic but, given the circumstances, it is at least some evidence of pretext.” *Id.*, 758 F.3d at 238)

Here, the shift *is* dramatic. DISD began with a PSO report finding Anderton had mixed motives for checking schedules and visiting campuses, and escalated to Mr. Abel's fearmongering about endangering children and interfering in a CPS investigation. This would give any jury pause. DISD's response is to refer the Court, twice, to a website on which the Texas Department of Family and Protective Services (DFPS) gives a simplified explanation of CPS, which states, "Child Protective Services (CPS) becomes involved with children and families when they are referred by the DFPS Investigations division, which investigates allegations of child abuse and neglect." DISD Br. 53 (n. 11) and 40 (n. 7), citing https://www.dfps.texas.gov/child_protection/.




This webpage is not evidence that "CPS does not remove children from their parents' custody unless there are allegations of child abuse or neglect," as DISD

insists. DISD Br. 40, n. 7. Even if it were true, that leaves a broad spectrum of children removed for neglect, i.e., because there are no adults in their home able to care for them. DISD claims that "while the PSO may not have investigated whether Anderton's actions placed the students in danger, it is common sense that they did." *Id.* In other words, DISD permits its "independent review system" to rely on utterly undisclosed, unsubstantiated considerations.

### E. INDEPENDENT REVIEW

The district court treated the LRC's review as genuinely independent, insulating Dr. Anderton's termination from any hint of discrimination. But the foregoing section illustrates that the LRC, to the extent it acted "independently," disregarded the carefully gathered interview notes, statements, and documentation of the PSO report, and without seeking clarification or confirmation from Chris Lyle, made its own unsupported assumptions regarding the events. It was only "common sense," evidently, to leap to the conclusion that Dr. Anderton's close friends must be dangerous abusers.

Conversely, the LRC failed to act independently when it came to questioning Chris Lyle regarding discrepancies between the witness statements and the report he issued. No one seems to have used common sense to ask why Dr. Anderton, certified to teach for over thirty years, and with a record of service in the district extending

back to 1988,[4] would endanger children. There has been no evidence of who is on the LRC other than Robert Abel, who testified – with no personal knowledge whatsoever – that the students' father was "a person that CPS was actively investigating based on allegations of abuse." ROA.524. (Abel Decl. ¶ 27).[5] What conclusions the other members leapt to is anyone's guess. Yet, by determining that the LRC's one-time meeting constituted an actual independent review, eliminating any causal connection to discrimination within Academic Service, the trial court resolved inferences in DISD's favor which should have been permitted to go to the jury.

## CONCLUSION

The district court departed from the appropriate review of the summary judgment record by resolving at least four disputed issues in favor of the movant, DISD: 1) whether the restructuring of Academic Services eliminated Dr. Anderton's role or simply transferred its function to Dr. Whitaker, and whether the surrounding context supported a finding that Dr. Whitaker had replaced Dr. Anderton as part of a "restructuring" that removed a score of older employees; 2) whether DISD's evolving and expanding rationale for termination was immaterial, as DISD argues,

[4] ROA.541-542. Anderton's "Official Dallas ISD Service Record," showing her employment in DISD from 1988-2001, and then from 2014-2024.
[5] The summary judgment record included records from DFPS, filed under seal, but DISD does not refer to them.

or substantially untrustworthy, supporting an inference of pretext; 3) whether the LRC's review was sufficiently independent to inoculate its result against discrimination; and 4) whether the contradictions in DISD's documentation indicate a lack of "reasonable belief" in its stated reasons for termination. Each of these disputed fact issues arise from DISD's own summary judgment evidence, and a reasonable jury could draw inferences in favor of Dr. Anderton regarding each.

Dr. Anderton respectfully requests that this Court reverse and remand for trial.

SUBMITTED BY:

*<u>/s/ Stefanie M. Klein</u>*
Stefanie M. Klein 11565650
Frank Hill 09632000
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222
(817) 274-9724 fax
sklein@hillgilstrap.com
fhill@hillgilstrap.com

ATTORNEYS FOR APPELLANT
AMY ANDERTON

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2026, a copy of the foregoing Reply Brief was served on all counsel of record through the court's electronic filing system.

*/s/ Stefanie M. Klein*
Stefanie M. Klein

## CERTIFICATE OF COMPLIANCE

Appellant certifies that this document complies with Federal Rule of Appellate Procedure 32(a)(7)(B) and 5th CIR. R32.1 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,649 words. It also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th CIR. R32.1, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared on a proportionally spaced typeface using Times New Roman in 14 font size.

*/s/ Stefanie Klein*
Stefanie Klein